102 N.J. Super. 258 (1968)
245 A.2d 773
JOSEPH DE MARCO, PLAINTIFF,
v.
THATCHER FURNACE COMPANY, A CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF DELAWARE AND AUTHORIZED TO DO BUSINESS IN NEW JERSEY; T.F.C. HOLDING CORP., A CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF DELAWARE AND AUTHORIZED TO DO BUSINESS IN NEW JERSEY; HOLLAND FURNACE COMPANY, A CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF DELAWARE AND AUTHORIZED TO DO BUSINESS IN NEW JERSEY AND ATHLONE INDUSTRIES, INC., A CORPORATION ORGANIZED UNDER THE LAWS OF THE STATE OF DELAWARE AND AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 22, 1968.
*262 Mr. John A. Craner for plaintiff (Messrs. Craner & Brennan, attorneys).
Mr. Thomas E. Walsh, Jr., for defendants (Messrs. Carpenter, Bennett & Morrissey, attorneys).
MINTZ, J.S.C.
Plaintiff Joseph R. DeMarco alleges that he was wrongfully discharged by his employer, Thatcher Furnace Company. He argues that his union did not adequately and fairly represent him in the grievance procedure prescribed in the collective bargaining agreement. As a result of his discharge, he was unemployed for several months. He seeks a money judgment for his loss of wages.
Thatcher Furnace Company was a Delaware corporation and a wholly owned subsidiary of Holland Furnace Company, also a Delaware corporation. In 1964 Thatcher Furnace Company changed its name to T.F.C. Holding Corp. On May 28, 1965 this company ceased doing business in New Jersey and apparently was dissolved. On May 24, 1966 Holland Furnace Company changed its name to Athlone Industries, Inc. It is urged that since T.F.C. Holding Corp. is out of business, this court should fashion its remedy by making plaintiff whole out of that company's assets in the hands of Athlone, since Athlone is really a trustee in dissolution for T.F.C. Holding Corp., the successor to Thatcher Furnace Company.
Plaintiff had been employed as a welder by the Thatcher Furnace Company (hereinafter the company) for approximately 13 years prior to his discharge on April 2, 1964. He was a member in good standing of the International Molders and Allied Workers Union, AFL-CIO, Local No. 305, and for almost a year prior to his discharge served as an elected committeeman for his department, the Plate Shop.
*263 The terms and conditions of employment at the company's plant were governed by successive "Conference Agreements"  collective bargaining contracts between the international union, the exclusive collective bargaining agent in the plant, and the Manufacturers' Industrial Relations Association (hereinafter M.I.R.A.) of which the company was a member.
During the summer of 1963 a dispute smoldered among the welders in the Plate Shop over the piece rates set by the company with respect to work on the tube bundle line. The international union was called in to time-study the welding jobs on the tube bundle line and reached a rate settlement with the company. Thereafter welders on the tube bundle line, notably plaintiff, renewed their complaints about unsatisfactory piece work rates and the company countered with charges that plaintiff had been wrongfully "controlling production" and urging other welders to do the same so as to convince the company that its piece work rates were unrealistically demanding. During this period plaintiff was consistently a leading producer among welders on the tube bundle line. As early as November 23, 1963 the company discharged plaintiff for "controlling production." Before plaintiff even filed a grievance, the union interceded on his behalf and shortly effected his reinstatement.
Upon plaintiff's return to his job the same bickering resumed and the company discharged him again on December 5, 1963. This time plaintiff filed a grievance pursuant to the "Conference Agreements" which read as follows:
"An employee who has been discharged, suspended or laid off, shall not suffer any loss of pay if it is found that such discharge * * * is unjust, provided the employee files a grievance promptly." Conference Agreements Between I.M. & A.W.U. and M.I.R.A. (1962-1963), Art. III, cl. 12, p. 11.
The company, plaintiff and the local union could not reach agreement through the first two steps of the grievance procedure outlined in the aforementioned "Conference Agreements." At step 3 Bernard Butsavage, a vice-president of the *264 International Union, was called in to meet with Mr. Grosser, the company lawyer. The company presented charts purporting to illustrate how plaintiff by his output engaged in the control of production on the tube bundle line. The union representative disclaimed the probative value of these charts for this purpose and plaintiff appeared at the conference to rebut the accusations leveled against him. No resolution of the grievance resulted at this step and the parties referred the grievance to step 4, a conference between the presidents of the international union and the M.I.R.A.
On January 6, 1964, with the grievance in this posture and plaintiff out of work for one month, executives of the company, the local's business agent Anthony Mastandrea, and several members of the local's shop committee met to discuss plaintiff's reinstatement and several other related matters. The company drafted an agreement which was signed and read in part as follows:
"1. We agree that control of production in order to affect prices unfairly is illegal and results in unjustifiably increasing cost. We will not engage in it nor condone it in others.
2. We agree that the methods of finish welding tube bundles will be changed and piece work prices reestablished on the basis of time study and a proper relationship between effort and earnings.
3. We agree that Joe DeMarco shall, in view of the above, be reinstated immediately, without back pay (but he will receive holiday pay for Christmas and New Year's Day).
4. We agree to recommend to Messrs. Butsavage and Grosser that the above constitute the final adjudication of this grievance and that they so agree in writing  in anticipation of this, this agreement is made effective as of the date hereof.
 E.B. Tuttle 
 ___________________________ E.B. Tuttle
 Gerald J. Toner Geo Gray 
 G. Toner George Gray
 E. Ostergaard H. Van Nest 
 E. Ostergaard H. Van Nest
 Joseph DeMarco 
 J. DeMarco"
*265 The above signatures on the left represent those of members of the local union shop committee, and those on the right of company executives. It appears that the agreement was drafted in expectation that Mastandrea would sign. However, although urging others to sign, Mastandrea unexplainedly refused to do so himself, and his name under the first signature line on the left was obliterated.
Grosser apparently accepted this local agreement as a final adjudication of the formal grievance, but there is a conflict in the evidence as to whether Butsavage ever did so.
After plaintiff's return to work on January 7, the company altered the method of welding tube bundles and conducted a new time study of the job and fixed a new piece rate. Plaintiff, on behalf of himself and other welders in the plate shop continued to press for a higher piece rate. Finally, on March 12, 1964 the Company filed a grievance against the arc welders of the plate shop, including plaintiff, wherein it accused them of violating the January 6 agreement by engaging in "control of production" during the course of the time studies and refusing to accept the new rates issued by the company on the revamped job. At a meeting convened on April 2, 1964 with union vice-president Butsavage present, the company discharged plaintiff once more. Plaintiff testified that Butsavage said this was the first time he had heard of the January 6 agreement and apparently expressed his disapproval of the same.
Plaintiff immediately filed a grievance and the union and the company agreed to reactivate the grievance machinery at step 4 and set a June 3, 1964 date for a conference between the president of the international union and the president of the M.I.R.A. Butsavage allegedly told plaintiff that this resort to the grievance machinery meant that the January 6 agreement was to be disregarded.
In the meantime, the Appeal Tribunal of the Division of Employment Security, New Jersey Department of Labor and Industry, upheld on May 22, 1964 a hearing examiner's decision that plaintiff had not been "discharged for misconduct *266 connected with his work" and hence was not disqualified from eligibility for unemployment benefits. N.J.S.A. 43:21-5 (b). The appeals examiner wrote that the company had not sustained its burden of proving that plaintiff had controlled production.
At the step 4 conference on June 3 the company again presented charts purporting to show how DeMarco purposely controlled his output. Again DeMarco appeared and again the union representative, contesting plaintiff's discharge, stated that the company's charts proved nothing. The parties failed to resolve the grievance at this level and referred it to step 5. There a conference committee, composed of six members of the M.I.R.A. and six union representatives, was to render a decision "final and binding on all parties concerned." Conference Agreements, supra, Art. II, sec. 2, cl. 11, p. 9. This procedure is characterized by the collective bargaining agreement as governed by the "principle of arbitration." Id., Art II, sec. 1, cl. 8, p. 7. Apparently no stenographic record of the proceedings was requested and none kept. There is no evidence as to what notice plaintiff had of the hearing, but he was not asked to attend nor did he request to do so. Also, no competent evidence was presented as to the substance of respective agruments made by the Union during the conference committee proceeding.
The decision of the conference committee, dated August 7, 1964, signed by the presidents of the international union and the M.I.R.A., is as follows:
"The Conference Committee met and considered all of the information on this discharge that had been presented to the officers at the third and fourth steps of the grievance procedure.
The agreement which was signed on January 6, 1964, reinstating Joseph De Marco to his job, was reviewed.
It was brought out that at the meeting between the President of the two Associations in the fourth step of the grievance procedure, Mr. De Marco stated that this agreement was meaningless except for the provision for his reinstatement.
It was found that the Thatcher Furnace Company carried out the terms of the January 6, 1964 agreement and did reinstate Mr. De Marco and as he did not carry out the terms of the agreement *267 with respect to his obligations as set forth, the Conference Committee decided that his discharge was for just cause because of his violation of the agreement."
Subsequent to notification of this decision, plaintiff filed a charge against his employer with the National Labor Relations Board alleging that the company had discharged him because of his union activities. He filed no unfair labor practice charge against the union, although in this suit he charges it violated its statutory duty of fair representation to him. After a two-month investigation the Regional Director of the N.L.R.B. refused to issue a complaint on DeMarco's charge. This decision was affirmed on appeal by the Office of the General Counsel of the Board.
The plaintiff claims that the company, by unjustly discharging him, violated the collective bargaining agreement and that the union, though not a party to this litigation and though it processed his grievance to arbitration, violated its duty of fair representation during the arbitral process in which plaintiff played no part. In Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), followed in Zalejko v. Radio Corp. of America, 98 N.J. Super. 76, 236 A.2d 160 (App. Div. 1967), it was held that if an employee has a meritorious grievance and if his union processes his grievance arbitrarily, discriminatorily or in bad faith  a breach of its statutory duty of fair representation  he may be entitled to an appropriate remedy. The defendant employer may set up as a defense to such suit the union's disposition of the grievance so long as the union honored its duty of fair representation in handling the employee's claim. In order to be entitled under this doctrine to a nullification of the conference committee decision and to a recovery from his employer for damages incurred by his discharge, plaintiff must prove both that the union violated its duty of fair representation to him and that the discharge was unjust.
Plaintiff predicates the union's alleged breach of its duty of fair representation in that it arbitrarily represented him before the conference committee. Plaintiff urges that his *268 case at step 5 of the grievance procedure was prejudiced by the following alleged derelictions by the union:
(1) Its failure to adduce additional evidence in support of plaintiff's denial that he controlled production.
(2) Its failure to argue that the company must produce evidence in addition to the controverted production charts in order to prove its case to the conference committee.
(3) Its failure to advocate at step 5 that the agreement of January 6, 1964 was null and void and no conference committee decision could be based upon it,
(a) because union vice-president Butsavage, whose assent was a requisite to the agreement's continued effectiveness, had repudiated it;
(b) because Butsavage, by reactivating at step 4 the grievance procedure established by the collective bargaining agreement, removed the locally executed document from consideration;
(c) because the agreement was "inconsistent with the collective bargaining agreement then in effect," sec. 9 (a), Labor Management Relations Act (1947), 29 U.S.C.A. 159 (a), amending National Labor Relations Act (1935), and is therefore contrary to the national labor policy and unenforceable.
Furthermore, he urges that the decision of the conference committee be nullified because his position was not adequately presented before it and because the union did not afford him an opportunity to appear personally or by counsel.
Defendants contend that the step 5 conference committee decision is an arbitration award within the meaning of N.J.S. 2A:24-1 to 11. It is argued that since plaintiff has neither complied with, nor does his complaint meet, the requisites for vacating an award, N.J.S. 2A:24-7, 8, relief based upon the doctrine of Vaca v. Sipes, supra, is foreclosed to him.
In Kenney v. McLean Trucking Co., 54 N.J. Super. 533 (App. Div. 1959), the court held that a committee, jointly and equally composed of international union officials and management association members and empowered to make decisions final and binding upon the affected parties, is essentially an arbitration committee created by the collective bargaining agreement of which plaintiff grievant is *269 a beneficiary. Hence, to challenge a determination of such a committee, a grievant must comply with the arbitration statute, N.J.S. 2A:24-1 to 11. A dissatisfied party must commence a summary action within three months of his receipt of the decision in order to vacate an award of arbitration. N.J.S. 2A:24-7. Plaintiff filed his complaint on May 10, 1967, almost 33 months after delivery to him of the Conference Committee decision. The grounds upon which a court may vacate an award in arbitration are specified in N.J.S. 2A:24-8. It would appear that an employee who had a Vaca claim against his union for its mishandling of his grievance at arbitration has no remedy under this statutory provision.
If the Vaca rule does not apply to a grievance processed to arbitration, this all but disposes of plaintiff's claim. However, Vaca points the other way. The case holds that where a collective bargaining agreement empowers a union to supervise the grievance machinery and invoke arbitration on behalf of the employees, a union does not breach its duty of fair representation, and thereby open up a suit by the employee for breach of contract, merely because it settled an employee's grievance short of arbitration, so long as said grievance was not disposed of arbitrarily, discriminatorily or in bad faith. The court did not discuss the converse proposition: that a union's recourse to arbitration for the disposition of a grievance necessarily immunizes it from a violation of said duty. Zalejko v. RCA, supra, which also involves a short-circuiting of the grievance procedure prior to arbitration, also sheds no light on this issue. In Vaca the Supreme Court suggests that to arbitrarily process an employee's grievance in a perfunctory fashion could result in a union's breach of its duty of fair representation, 386 U.S., at p. 191. It is plaintiff's contention that a union, even while processing a grievance to arbitration, can breach its duty in its role as advocate of said grievance at arbitration.
Under a regime of collective bargaining the possibility of a conflict of interests between individual employees or groups *270 of employees and the bargaining unit represented by a union is indeed real. For an example of a careful legislative attempt to balance these interests in the settlement of grievances see section 9(a) of the Labor Management Relations Act (1947). The Supreme Court of Wisconsin in Clark v. Hein-Werner Corp., 8 Wisc.2d 264, 99 N.W.2d 132 (1959), rehearing denied 100 N.W.2d 317 (1960), addressed the issue of potential conflict of interests between the union which administers the grievance procedure and the grieving employee. The court said:
"So long as the union is fighting the battle of the employees through the arbitration proceeding the employees' interests are being represented and there is no need for courts to provide protection to the employees. Sound public policy dictates that a court should not interfere with or disturb the orderly working of the arbitration process unless a compelling reason for invoking the court's equitable powers is presented. One of the principal purposes of arbitration is to reach a speedy final result and to avoid protracted litigation.
However, as pointed out in a Comment in 6 U.C.L.A. Law Review (1959), 603, 628, `Often the substantial interests of the individual employee and the union diverge. At this point it is difficult for the union to adequately represent the individual's interest. This may occur when he is a non-union member of the collective-bargaining unit, or he belongs to a minority faction of the union, or he is the `square peg in the round hole' type, or merely because the union officials do not believe in his claim.' * * *" (99 N.W.2d, at p. 135)
When unions and grievants differ, rather than risk a charge of betrayal by rejecting the worker's claim at earlier steps of the grievance process, unions have been known to carry such grievances to binding arbitration. Although a union may then offer only token representation of the grievant's case, and indeed may even in an unrecorded proceeding make its indifference known to the arbitrator, the onus of responsibility for the decision is shifted from the union to the arbitrator. Report of Committee of Improvement of Administration of Union Management Agreements, 1954  Individual Grievances, 50 Nw. U.L. Rev. 143, note 1, at p. 155 (1955), cited in Note, 66 Yale L.J. 946, 947 *271 (1957). In the present case the collective bargaining agreement gives the union, and not the employee, the sole power to invoke the latter stages of the grievance procedure and does not provide for the grievant to appear at step 5. Thus, all of the above concerns are present in the instant case.
Judicial protection could be extended to employees whose interests were not being represented by the union in the arbitral process by reopening the arbitration to permit the grievant to appear, Clark v. Hein-Werner Corp., supra, or by imposing upon the union a duty to fairly advocate the grievance. The latter method appears consonant with the court's desire in Vaca not to undermine the exclusive power of unions and management over the administration of the grievance procedure. Generally, under the rule of this case dissatisfied grievants must be bound by their union's representation of their interests and cannot attempt to override settlements of their grievances, either in court or through the internal grievance machinery, absent some specific malfeasance by the union. See Note, 81 Harv. L. Rev. 252, 253 (1967); Note, 77 Yale L.J. 559, 561 (1968).
It might seem that judicial intervention on behalf of grievants in the arbitral process would conflict with the strong public policy of the courts to refuse to review the merits of arbitration awards. See United Steelworkers v. Enterprise Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). However, in view of a union's duty of fair representation to employees, I am doubtful that this judicial policy of nonintervention in arbitration awards should necessarily bar a court from scrutinizing the manner by which a union advocates a grievance in arbitration. Since the grounds for a court's reversal of an arbitration award under Vaca are stringent and the grievant must shoulder the added burden of documenting a union's conduct in the arbitration proceeding, it does not appear that the arbitral process would be much disturbed if the duty of fair representation were extended to include the union's advocacy of the grievant's cause during the arbitration proceeding.
*272 Under the controlling "Conference Agreements" herein, there is no provision for an impartial arbitrator of grievances. International union and management officials equally comprise the conference committee panel. Although there is no express provision for advocacy of the grievant's claim before the conference committee, it would appear that in an arbitration proceeding of this peculiar nature it becomes the duty of the union representatives on the committee to adequately present the grievant's case to the whole panel.
The accommodation of this safeguard for grievants in arbitration with N.J.S. 2A:24-8 is still another matter. Kenney v. McLean Trucking Co., supra, is not dispositive on this issue. There the grieving employee, disappointed by an arbitration award, sued the arbitration committee and its secretary for damages for their alleged interference with his rights as an employee. No breach of his union's fiduciary duties was alleged. In setting up the arbitration award and N.J.S. 2A:24-8 as a bar to relief, the court stated that it "would be intolerable to countenance" plaintiff's action, 54 N.J. Super., at p. 540, because, it implied, exposing industrial arbiters to liability would jeopardize the usefulness of the arbitral process, a most valuable procedure for the prevention of industrial strife. See United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). This rationale has only marginal force in regard to the application to the arbitral process of the Vaca doctrine, for as observed above, a breach of the duty of fair representation is carefully restricted so as not to interfere unduly with the collectively bargained for grievance procedure.
On the other hand, see Note, 14 Rutgers L. Rev. 143, 184 (1959) for a plea that the judiciary "will scrupulously limit themselves to the grounds set out in the [arbitration] statute for * * * vacation of an award." Yet section (c) of N.J.S. 2A:24-8, which permits vacation of an arbitration award if the arbitrator refuses to hear evidence "pertinent and material *273 to the controversy," offers a possibly helpful analogy. It is concerned with evidentiary decisions by the arbitrator which prevent him from making an informed judgment. Wthen a union represents a grievant whose interests diverge from those of the group, a faulty presentation of the grievant's case by the union creates the same undesirable result.
As already noted, plaintiff in effect urges that the conference committee decision be disregarded. Hence, the complaint should be treated as including an application to vacate an arbitration award. Assuming, arguendo, that in light of Vaca plaintiff is not bound by the three-month limitation in which to initiate such proceeding, N.J.S. 2A:24-7, and that he is not limited on such application by the provisions of N.J.S. 2A:24-8, I find that plaintiff has failed to sustain his dual burden of proving both a meritorious breach of contract claim against the company and a breach of the duty of fair representation by the union.
As noted earlier, Vaca set forth the view that a union violated its statutory duty of fair representation to a grieving employee when its conduct toward him is arbitrary, discriminatory or in bad faith. But the court found that the grievant's union did not breach its duty under the facts of that case. Owens, the original plaintiff, had been dismissed from his job because of poor health. The union initiated a grievance, but upon receiving an unfavorable medical report, decided to drop the grievance at the fourth step just prior to arbitration, and instead urged Owens to accept a company offer to refer him to a rehabilitation center. Owens refused and filed suit against the union in a Missouri state court. The Supreme Court, in finding no breach, cited the union's attempt to gather sufficient medical evidence to prove Owens' case, its efforts at securing less vigorous work or rehabilitation treatment for him, and the lack of any evidence of personal hostility by union officials toward the grievant.
In Zalejko v. Radio Corp. of America, supra, the court applied the doctrine of Vaca to its facts and held that the *274 union had violated its statutory duty to the grievant and granted relief. In that case the grievant had been injured in an accident and had been granted a medical leave of absence by the employer because she was physically unable to work. About two months later the plant physician concluded that grievant was physically able to resume her job and the company terminated grievant's medical leave. When grievant failed to return to work, RCA terminated her employment. Plaintiff filed a grievance which the union processed through the first four steps of the grievance procedure, without resolution. At this point the employer offered to reinstate plaintiff, but she refused, claiming continued physical disability. The union's attorney then advised it that under the terms of the collective bargaining agreement an employee was under a duty to return to work or face termination if the plant physician certified that the employee was able to return. Based upon his advice and the other information before it, the union notified RCA that it did not intend to process the grievance to arbitration. The Appellate Division affirmed the trial court's referral of the grievance to arbitration on the ground that the union's conduct, in following the advice of its attorney and in making no effort to obtain or present to the company available medical reports favorable to the grievant, could be distinguished from that of the union in Vaca and did not constitute fair representation of her on her grievance.
The instant case, unlike Vaca and Zalejko, does not involve a union's decision to short-circuit the processing of a grievance. Instead at issue here is the fairness of the union's advocacy of plaintiff's cause before an arbitration panel, the proceedings of which are not stenographically recorded.
Plaintiff urges that the arbitration decision should be nullified because in several respects the union did not provide him fair representation before the conference committee and did not afford him an opportunity to present his own case personally or by counsel. He complains that the union made no effort to unearth additional evidence to support his denial that he controlled production or advocated that others do so. *275 Among the important indicia of a union's fair representation which the court cited in both the Vaca and Zalejko cases was that it had "attempted to gather sufficient evidence to prove [grievant's] case," 386 U.S., at p. 194, 87 S.Ct., at p. 919; 98 N.J. Super., at p. 81. Unlike the situation in Zalejko, the record reveals no item of evidence offered to the union but rejected by it, or any material item which it could have discovered with any investigative effort which rebuts the company's assertions that plaintiff broke his agreement not to control production.
The argument that the union allegedly neglected to demand that the company present the conference committee with a degree of proof that plaintiff broke his agreement higher than that represented by the disputed work performance charts also carries no weight. The record contains no evidence as to whether the union made such a demand or whether the company did in fact supplement its evidence at the arbitration proceeding. Nor does the record show whether the union altered its position and decided to concede the probity of the charts. Plaintiff seems to think that because the work performance chart did not satisfy the union representative at step 4 and no further proof was adduced by the company at arbitration, the conference committee composed of as many labor as management representatives could not in majority conceivably find against him. This view reflects a misconception of the role of the union members of the conference committee. They are essentially arbitrators. Because one or several union officials took a certain position on an offer of proof at one stage of the grievance procedure, this position cannot bind the entire union contingent. Otherwise step 5 arbitration would invariably terminate in deadlock and be inoperable.
The aspect of the union's handling of plaintiff's case which appears to upset plaintiff most is that, on the one hand, he says international vice-president Butsavage led him to believe that by invoking step 4 of the grievance procedure the agreement of January 6, 1964 could be considered repudiated, *276 and, on the other, the conference committee based the propriety of plaintiff's discharge on his violation of the self-same agreement and not flatly on his alleged endeavors to control production.
De Marco asserts that Butsavage's statement seemed to have considerable force to him. The agreement of January 6, 1964 provided in somewhat ambiguous language that it was effective from its execution but that the occurrence of the condition subsequent of the refusal of either Butsavage or Grosser to assent would invalidate the agreement. Grosser did assent; the evidence conflicts as to whether Butsavage ever did so. The company grievance filed March 13, 1964 asserts that Butsavage had given his consent. Plaintiff's hearsay recollection of Butsavage's comments on April 2, 1964 were that the latter claimed ignorance of said agreement. Assuming for the sake of argument that the union's knowing failure to advocate at arbitration the ineffectiveness of the agreement by reason of Butsavage's nonassent constituted a breach of its duty of fair representation, plaintiff has failed to sustain his burden of proving his premise that Butsavage had not approved the agreement. If the union believed such assent had been given, its decision not to argue this issue is clearly not arbitrary.
Plaintiff also testified that Butsavage told him he could disregard the January 6 agreement because the union and company were to reactivate the grievance machinery for his claim at the step 4 stage. Plaintiff faults the union for not pressing in arbitration the position that a return to the grievance procedure rendered the January 6 agreement meaningless. The conference committee decision indicates quite clearly it considered plaintiff's position, which is based upon Butsavage's alleged advice. Perhaps the union disavowed its vice-president's opinion or perhaps plaintiff misunderstood Butsavage. In any event, plaintiff's position was made known to the arbitrators. Since plaintiff proffers no other evidence or authority which the union could have utilized in his behalf, even if it, as alleged, yielded to the conclusion *277 that the agreement was valid and binding despite the reinstitution of the grievance procedure, such conduct with respect to the grievant is not arbitrary.
Plaintiff also complains that the union should have objected to the arbitration tribunal that the January 6, 1964 agreement violated the proviso of section 9(a) of the Labor Management Relations Act, that any private grievance adjustment must not be "inconsistent with the collective bargaining agreement then in effect", and should be nullified. The presence of Mastandrea, the union's business representative, at the discussions prior to and at the execution of the agreement, satisfied the statutory condition that the union be given an opportunity to be present at the private settlement. Assuming that the agreement's provision that the company change the methods of welding tube bundles, conduct a time-study and re-establish the piece work rate on the line is inconsistent with the collective bargaining agreement, the exclusive bargaining agent, the party for whom this proviso is designed to benefit, chose not to challenge the private adjustment on this ground. That choice is within its discretion and not the grievant's.
Hence, plaintiff failed to sustain his burden of proof that the union violated its duty of fair representation in its advocacy at an arbitration hearing of which there is no record. But plaintiff also asserts that he is entitled to a vacation of the award and damages against the company because the union did not afford him notice of the arbitration hearing and an opportunity to appear personally or by counsel.
As earlier noted, some commentators have concluded that in certain situations an employee must present his own case at the arbitral proceeding, not merely to secure more effective representation but to obtain any representation at all. Note, 66 Yale L.J. 946, 947 (1957). For instance, see Clark v. Hein-Werner Corp., supra, in which it was held that certain nonunion employees who were engaged in a seniority dispute with union members and represented at arbitration by a union hostile to their interests were deprived of due *278 process when they were not afforded proper notice of the arbitral hearing. This plaintiff, however, presents no evidence to show that the union was hostile to him or his grievance, which might lead to the inference that at arbitration the grievant could only expect perfunctory advocacy. On the contrary, the testimony is to the effect that at least at step 3 and step 4 the union steadfastly supported plaintiff. In these circumstances it would appear plaintiff's grievance did not present any peculiar aspects calling for a departure from the terms of the collective bargaining agreement investing the union with sole power to administer the final three steps of the grievance procedure.
Finally, plaintiff is barred from relief against the company because he has failed to sustain his burden of proving that he was unjustly discharged.
At several stages of the grievance procedure the company presented work performance charts which purportedly proved that DeMarco had controlled his own output. Plaintiff can only deny their probity and point to the union's agreement with him at various steps of the grievance procedure on this point. His status as leading producer on the tube bundle line welding operation and as the worker whose output approached closest to the time study rates certainly does not logically preclude the probability that he "controlled" his output.
The finding of the Appeal Tribunal of the State Division of Employment Security that plaintiff had not been "discharged for misconduct connected with his work" is not persuasive. It is not binding on this court and resulted from a failure by the company to sustain a burden of proof. As noted above, the burden of proof in this matter lies with DeMarco.
Judgment for defendants. An appropriate form of judgment will be submitted, consented to as to form or to be settled on notice.