EASTERN FREIGHT WAYS, INC.,
Plaintiff,

v.

LOCAL UNION NO. 707, HIGHWAY AND LOCAL MOTOR FREIGHT DRIVERS, DOCKMEN AND HELPERS affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 707 Labor-Management Grievance Committee, and Empire State Highway Transportation Association, Inc., Defendants.

No. 69 Civ. 313.

United States District Court
S. D. New York.

June 11, 1969.

Zoloto, Zurkow & Donati, New York City, for plaintiff.

Cohen & Weiss and Zelby & Burstein, New York City, for defendants.

OPINION

EDELSTEIN, District Judge.

The genesis of the motion before this court lies in the failure of the New York and Worcester Express, Inc., (hereinafter Worcester) to make certain payments on behalf of certain union employees of Worcester for wages, vacation pay, and

for pension and welfare contributions owing to these union employees of Worcester.[1] All of these claims allegedly were incurred during the first several months of 1967 and relate exclusively to employees hired by Worcester prior to 1967.

The Union alleges that Eastern Freight Ways Inc., (hereinafter Eastern) is a "successor" to Worcester as that terms is used in Article I, Sec. 5[2] of the Worcester-Union collective bargaining agreement, that consequently Eastern is subject to and bound by the terms of that collective bargaining agreement, and that as a result Eastern must arbitrate its alleged liability for Worcester's debts before the grievance committee established pursuant to Art. VII[3] of the Worcester-Union collective bargaining agreement. Eastern brings on this motion for final judgment and seeks a permanent injunction against defendants from conducting a grievance committee hearing or arbitration on the ground that it is not as a matter of law a successor such that it can be forced to arbitrate. Eastern also asks for a declaratory judgment[4] that it is not a successor and in the alternative that if it is a successor it is a successor only to the extent of ten percent of Worcester's original debt. Defendant Union opposes these motions.

The nature of these motions can best be understood against the background, the events of which transpired commencing in 1967. In the early part of 1967 Worcester was on the verge of bankruptcy. On approximately March 3, 1967, Eastern entered into a written agreement[5] to purchase from individual stockholders of Worcester shares of the capital stock of Worcester, then owned by them, subject to the approval of the Interstate Commerce Commission. Pursuant to that agreement an application was made to the Interstate Commerce Commission under § 210a(b) of the Interstate Commerce Act for approval of temporary management by Eastern of Worcester pending the Commission's action upon the application for approval of Eastern's acquisition of the individual stockholders capital stock of Worcester. Approval was granted by the I.C.C. and on April 25, 1967, Eastern assumed such management. As such managing agent, Eastern, by law, could and did act as agent, but only as agent, for Worcester.

On May 3, 1967, a petition for arrangement of the liabilities of Worcester under Chapter XI of the National Bankruptcy Act was filed by Worcester in the United States District Court for the Southern District of New York. By order of Referee Herzog, the Referee in Bankruptcy, dated December 31, 1968,

1. The debts owed included approximately $17,000 to the Pension and Welfare Funds, and approximately $6,000 in earned vacation pay and wages.

2. "Section 5: This Agreement shall be binding upon the parties hereto, their successors, administrators, executors, and assigns. In the event an entire operation or any part thereof is sold, leased, transferred or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceedings, such operation shall continue to be subject to the terms and conditions of this Agreement, for the life thereof. * * *"

3. "ARTICLE VII. Grievance Committee "The Employer and the Union shall designate three (3) members each to act as a Grievance Committee. The Grievance Committee shall operate under rules of procedure which have been separately

executed. The Grievance Committee shall have jurisdiction over all disputes and grievances involving the Employer and the Union, and shall be authorized, by majority vote, to settle or dispose of any matter referred to it by the parties. Records of Employees, pay and time sheets shall be made available to the Union upon demand."

4. The motion for a permanent injunction is brought under F.R.Civ.P. 65; the motion for a declaratory judgment is brought under F.R.Civ.P. 57. The court will treat the motions as if they were brought under F.R.Civ.P. 56 because final judgment is sought.

5. The Worcester-Eastern agreement provided that profits and losses of Worcester during the temporary authority granted to Eastern should, respectively, belong to Worcester and be borne by Worcester.

the plan of arrangement of Worcester with its creditors was confirmed. The arrangement was confirmed with the knowledge of and participation by the Union. It is clear that the Union filed a proof of claim against Worcester in the said proceedings for the identical claim which the Union now seeks to pursue against Eastern as Worcester's successor. Moreover, a stipulation was executed by Cohen and Weiss, attorneys herein for the Union, accepting the plan of arrangement.

Worcester's obligation to the Union under the said order of confirmation was for Worcester to pay ten percent of the original debt. This ten percent is not an issue in this case; it has been paid or it is in the process of being paid. It is, rather, the ninety percent of the original debt which is the subject matter of the Union's claim.

The order of confirmation, *inter alia,* provides:

"11. [T]he debtor's arrangement, as confirmed by this order, shall be binding upon the debtor, and upon all its creditors, whether or not they are affected by the arrangement or whether or not they have accepted it.

"12. [A]ll creditors affected by the terms of the debtor's arrangement be, and they are hereby FOREVER RESTRAINED AND ENJOINED from taking any further action or proceeding in connection with their said claims, except to enforce the consummation of the terms of the capital arrangement, as confirmed by this order."

The legal issues before this court are two: (1) who—the court or the Grievance Committee—determines if Eastern is a successor such that Eastern must arbitrate its dispute before the Grievance Committee; and (2) if it be incumbent upon this court to resolve the first issue, then is Eastern, in fact, successor?

The first issue poses hardly any problem at all. The Union's position that the court's "limited function" in this matter "is to determine whether a dispute is within the scope of the grievance and arbitration provisions in the collective bargaining agreement" ignores and flies in the face of the clear command of John Wiley and Sons, Inc., v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) [6] which lays this issue to rest. That case involved an action by a union to compel arbitration. The court, confronted with a problem identical to the one before this court said:

"The threshold question in this controversy is who shall decide whether the arbitration provisions of the collective bargaining agreement survived the Wiley-Interscience merger, so as to be operative against Wiley. Both parties urge that this question is for the courts. Past cases leave no doubt that this is correct. Under our decisions, whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241 [82 S.Ct. 1318, 1320, 8 L.Ed.2d 462]. *Accord, e. g.,* United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, [80 S.Ct. 1347, 4 L.Ed.2d 1409] * * *." (at 546–547, 84 S.Ct. at 912)

Clearly, under *Wiley,* the court, and not the Grievance Committee, decides if a party must arbitrate.

The court now moves to the second issue: whether Eastern is in fact a successor such that the Grievance Committee may arbitrate Eastern's alleged liability for the debts of Worcester in excess of the ten percent settled upon in the Order of Confirmation entered by the Referee in Bankruptcy.

---

6. Like the *Wiley* court, this court is aware of the strong policy considerations in favor of arbitration. See *Wiley* at 549, 84 S.Ct. 909. But as in *Wiley* these considerations are not compelling in the circumstances at hand.

The Eastern-Worcester relationship presents the kind of mix which negates a finding of a successor relationship. The Eastern-Worcester agreement provides that the profits and losses of Worcester during the temporary authority granted to Eastern shall respectively belong to Worcester and be borne by Worcester alone. Eastern has not assumed any of the obligations of Worcester.

Eastern has been and still is a separate and distinct corporate entity with its own certificates of public convenience and necessity issued by the Interstate Commerce Commission and the Commonwealth of Massachusetts, valid and in force, its own offices, its own banking accounts, its own employees, its own assets, and its own liabilities. Eastern has not taken over ownership of or title to any of the assets of Worcester. Worcester has never merged with Eastern and its corporate distinctness as a separate entity has remained unchanged. Eastern has its own business, separately operated; its customers are different from Worcester's customers; Eastern and Worcester, respectively, have different collective bargaining agreements with different unions, which, in Eastern's case, does not include any collective bargaining agreement with Local 707, or, for that matter, the Worcester-Union collective bargaining agreement has not been terminated, nor has Worcester disavowed its obligations thereunder.

This is not a case such as *Wiley* which involved a consensual merger. Nor is it a case such as United States Gypsum Co. v. United Steelworkers, 384 F.2d 38 (5th Cir. 1967), cert. denied 389 U.S. 1042, 88 S.Ct. 783, 19 L.Ed.2d 832 (1968) which involved the purchase of all of the assets and property of a corporation. A duty to arbitrate does not survive in every case in which the ownership or corporate structure of an enterprise is changed. *Wiley* at 551 of 376 U.S., 84 S.Ct. 909.

Nor is the "substantial continuity of identity" test of *Wiley*[7] urged by the Union helpful here, considering that Worcester still exists as a separate business entity. To the extent that the test is germane, it is doubtful if Eastern's present activities are substantially identical to Worcester's earlier ones.

Upon consideration of all the facts and the law to be applied to those facts, this court finds that Eastern is not a successor to Worcester.

On the other hand, even if Eastern were to be deemed a successor, it is clear, nevertheless, that Eastern can be a successor only to ten percent of the obligations originally claimed against Worcester by the Union. The essential effect of the Order of Confirmation was to reduce the Union's claims to ten percent of the original debt due it. Moreover, the Union, as well as all other creditors, have been permanently enjoined from taking any further action in pursuit of their claims. Thus, the Union's attempt to arbitrate on the identical claims involved in the bankruptcy proceedings would appear to be in violation of the Order of Confirmation.[8]

But that aside, under the Bankruptcy Law, the original debt of Worcester was expunged; rather, it has been replaced by the obligations set forth in the Order of Confirmation. 11 U.S.C. § 771 is clear and provides that "The confirmation of an arrangement shall discharge a debtor from all his unsecured debts and liabili-

7. "[T]here may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without." *Wiley* at 551, 84 S.Ct. at 915.

8. See also 11 U.S.C. § 767 which provides that "Upon confirmation of an arrangement—1. The arrangement and its provisions shall be binding upon the debtor, * * * and upon all creditors of the debtor, whether or not they are affected by the arrangement or have accepted it or have filed their claims, and whether or not their claims have been scheduled or allowed and are allowable; * * *"

ties provided for by the arrangement. * * * "

The Bankruptcy Law consequently has discharged Worcester to the extent of ninety percent of its original obligation owed to the Union. Therefore, even if Eastern were to be deemed to be a successor of Worcester it then would be bound to pay only ten percent of Worcester's original obligation. But, that ten percent is not an issue in this case for Eastern does not deny its obligation as guarantor of that ten percent debt. Neither the Union nor the Grievance Committee can be permitted to thwart the clear mandate of the Bankruptcy Act.[9]

The Union, in attempting to frustrate final judgment, urges that there is an area of dispute relating to a purported guarantee by Eastern which allegedly guaranteed the ninety percent of Worcester's original debt. In effect, the Union alleges that there is a separate contract between Eastern and the Union by which Eastern agreed to guarantee the ninety percent of the original debt. Although there may be factual issues involving a purported guarantee, they are collateral to the issues at bar and therefore not relevant in this proceeding.

After a careful consideration of the oral arguments, together with the record, including the statements required by Local Rule 9(g), the court concludes that there are no genuine issues of material fact. Accordingly, this matter is ripe for final judgment. It is the judgment of this court that Eastern is not a successor to Worcester within the meaning of Worcester's collective bargaining agreement with the Union, that Eastern consequently is not obligated to participate in arbitration proceedings with the Union, and that therefore the Grievance Committee is hereby permanently enjoined from conducting the planned Labor-Management Grievance Committee Hearing.

So ordered.

9. This court reiterates its awareness of the place that arbitration holds in the national labor policy and of the desirability of that policy insofar as it promotes industrial stabilization through collective bargaining. United Steel Workers of America v. Warrior and Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Monroe Sander Corp. v. Livingston, 377 F.2d 6 (2d Cir. 1967), cert. denied 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967).