UNITED STEELWORKERS OF AMERICA *v.*
WARRIOR & GULF NAVIGATION CO.

No. 443.   Argued April 27, 1960.—Decided June 20, 1960.

*David E. Feller* argued the cause for petitioner. With him on the brief were *Arthur J. Goldberg, Elliot Bredhoff, James P. Clowes* and *Carney M. Layne.*

*Samuel Lang* argued the cause for respondent. With him on the brief were *Richard C. Keenan* and *T. K. Jackson, Jr.*

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. JUSTICE BRENNAN.

Respondent transports steel and steel products by barge and maintains a terminal at Chickasaw, Alabama, where it performs maintenance and repair work on its barges. The employees at that terminal constitute a bargaining unit covered by a collective bargaining agreement negotiated by petitioner union. Respondent between 1956 and 1958 laid off some employees, reducing the bargaining unit from 42 to 23 men. This reduction was due in part to respondent contracting maintenance work, previously done by its employees, to other companies. The latter used respondent's supervisors to lay out the work and hired some of the laid-off employees of respondent (at reduced wages). Some were in fact assigned to work on respondent's barges. A number of employees signed a grievance which petitioner presented to respondent, the grievance reading:

> "We are hereby protesting the Company's actions, of arbitrarily and unreasonably contracting out work to other concerns, that could and previously has been performed by Company employees.

> "This practice becomes unreasonable, unjust and discriminatory in lieu [*sic*] of the fact that at present

there are a number of employees that have been laid off for about 1 and ½ years or more for allegedly lack of work.

"Confronted with these facts we charge that the Company is in violation of the contract by inducing a partial lock-out, of a number of the employees who would otherwise be working were it not for this unfair practice."

The collective agreement had both a "no strike" and a "no lockout" provision. It also had a grievance procedure which provided in relevant part as follows:

"Issues which conflict with any Federal statute in its application as established by Court procedure or matters which are strictly a function of management shall not be subject to arbitration under this section.

"Should differences arise between the Company and the Union or its members employed by the Company as to the meaning and application of the provisions of this Agreement, or should any local trouble of any kind arise, there shall be no suspension of work on account of such differences but an earnest effort shall be made to settle such differences immediately in the following manner:

"A. For Maintenance Employees:

"First, between the aggrieved employees, and the Foreman involved;

"Second, between a member or members of the Grievance Committee designated by the Union, and the Foreman and Master Mechanic.

.        .        .        :        .

"Fifth, if agreement has not been reached the matter shall be referred to an impartial umpire for decision. The parties shall meet to decide on an umpire acceptable to both. If no agreement on selection of an umpire is reached, the parties shall jointly peti-

tion the United States Conciliation Service for suggestion of a list of umpires from which selection will be made. The decision of the umpire shall be final." Settlement of this grievance was not had and respondent refused arbitration. This suit was then commenced by the union to compel it.[1]

The District Court granted respondent's motion to dismiss the complaint. 168 F. Supp. 702. It held after hearing evidence, much of which went to the merits of the grievance, that the agreement did not "confide in an arbitrator the right to review the defendant's business judgment in contracting out work." *Id.,* at 705. It further held that "the contracting out of repair and maintenance work, as well as construction work, is strictly a function of management not limited in any respect by the labor agreement involved here." *Ibid.* The Court of Appeals affirmed by a divided vote, 269 F. 2d 633, the majority holding that the collective agreement had withdrawn from the grievance procedure "matters which are strictly a function of management" and that contracting out fell in that exception. The case is here on a writ of certiorari. 361 U. S. 912.

We held in *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, that a grievance arbitration provision in a collective agreement could be enforced by reason of § 301 (a) of the Labor Management Relations Act [2] and that the policy to be applied in enforcing this type of arbitration

---

[1] Section 301 (a) of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185 (a), provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." See *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448.

[2] Note 1, *supra.*

was that reflected in our national labor laws. *Id.*, at
456–457. The present federal policy is to promote indus-
trial stabilization through the collective bargaining agree-
ment.[3] *Id.*, at 453–454. A major factor in achieving
industrial peace is the inclusion of a provision for arbitra-
tion of grievances in the collective bargaining agreement.[4]

Thus the run of arbitration cases, illustrated by *Wilko*
v. *Swan*, 346 U. S. 427, becomes irrelevant to our problem.
There the choice is between the adjudication of cases or
controversies in courts with established procedures or even
special statutory safeguards on the one hand and the
settlement of them in the more informal arbitration
tribunal on the other. In the commercial case, arbitra-
tion is the substitute for litigation. Here arbitration is
the substitute for industrial strife. Since arbitration of
labor disputes has quite different functions from arbitra-
tion under an ordinary commercial agreement, the hos-
tility evinced by courts toward arbitration of commercial
agreements has no place here. For arbitration of labor
disputes under collective bargaining agreements is part
and parcel of the collective bargaining process itself.

The collective bargaining agreement states the rights
and duties of the parties. It is more than a contract; it is
a generalized code to govern a myriad of cases which the
draftsmen cannot wholly anticipate. See Shulman, Rea-
son, Contract, and Law in Labor Relations, 68 Harv. L.

---

[3] In § 8 (d) of the National Labor Relations Act, as amended by
the 1947 Act, 29 U. S. C. § 158 (d), Congress indeed provided that
where there was a collective agreement for a fixed term the duty to
bargain did not require either party "to discuss or agree to any
modification of the terms and conditions contained in" the contract.
And see *Labor Board* v. *Sands Mfg. Co.*, 306 U. S. 332.

[4] Complete effectuation of the federal policy is achieved when the
agreement contains both an arbitration provision for all unresolved
grievances and an absolute prohibition of strikes, the arbitration
agreement being the *"quid pro quo"* for the agreement not to strike.
*Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 455.

Rev. 999, 1004–1005. The collective agreement covers the whole employment relationship.[5] It calls into being a new common law—the common law of a particular industry or of a particular plant. As one observer has put it: [6]

".... [I]t is not unqualifiedly true that a collective-bargaining agreement is simply a document by which the union and employees have imposed upon management limited, express restrictions of its otherwise absolute right to manage the enterprise, so that an employee's claim must fail unless he can point to a specific contract provision upon which the claim is founded. There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. Within the sphere of collective bargaining, the institutional characteristics

---

[5] "Contracts which ban strikes often provide for lifting the ban under certain conditions. Unconditional pledges against strikes are, however, somewhat more frequent than conditional ones. Where conditions are attached to no-strike pledges, one or both of two approaches may be used: certain *subjects* may be exempted from the scope of the pledge, or the pledge may be lifted after certain *procedures* are followed by the union. (Similar qualifications may be made in pledges against lockouts.)

"Most frequent conditions for lifting no-strike pledges are: (1) The occurrence of a deadlock in wage reopening negotiations; and (2) violation of the contract, especially non-compliance with the grievance procedure and failure to abide by an arbitration award.

"No-strike pledges may also be lifted after compliance with specified procedures. Some contracts permit the union to strike after the grievance procedure has been exhausted without a settlement, and where arbitration is not prescribed as the final recourse. Other contracts permit a strike if mediation efforts fail, or after a specified cooling-off period." Collective Bargaining, Negotiations and Contracts, Bureau of National Affairs, Inc., 77:101.

[6] Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1498–1499 (1959).

and the governmental nature of the collective-bargaining process demand a common law of the shop which implements and furnishes the context of the agreement. We must assume that intelligent negotiators acknowledged so plain a need unless they stated a contrary rule in plain words."

A collective bargaining agreement is an effort to erect a system of industrial self-government. When most parties enter into contractual relationship they do so voluntarily, in the sense that there is no real compulsion to deal with one another, as opposed to dealing with other parties. This is not true of the labor agreement. The choice is generally not between entering or refusing to enter into a relationship, for that in all probability pre-exists the negotiations. Rather it is between having that relationship governed by an agreed-upon rule of law or leaving each and every matter subject to a temporary resolution dependent solely upon the relative strength, at any given moment, of the contending forces. The mature labor agreement may attempt to regulate all aspects of the complicated relationship, from the most crucial to the most minute over an extended period of time. Because of the compulsion to reach agreement and the breadth of the matters covered, as well as the need for a fairly concise and readable instrument, the product of negotiations (the written document) is, in the words of the late Dean Shulman, "a compilation of diverse provisions: some provide objective criteria almost automatically applicable; some provide more or less specific standards which require reason and judgment in their application; and some do little more than leave problems to future consideration with an expression of hope and good faith." Shulman, *supra*, at 1005. Gaps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement. Many of the specific prac-

tices which underlie the agreement may be unknown, except in hazy form, even to the negotiators. Courts and arbitration in the context of most commercial contracts are resorted to because there has been a breakdown in the working relationship of the parties; such resort is the unwanted exception. But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement. The grievance procedure is, in other words, a part of the continuous collective bargaining process. It, rather than a strike, is the terminal point of a disagreement.

The labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed be foreign to the competence of courts.

"A proper conception of the arbitrator's function is basic. He is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept. He has no general charter to administer justice for a community which transcends the parties. He is rather part of a system of self-government created by and confined to the parties. . . ." Shulman, *supra,* at 1016.

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial

common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpreta-

tion that covers the asserted dispute. Doubts should be resolved in favor of coverage.[7]

We do not agree with the lower courts that contracting-out grievances were necessarily excepted from the grievance procedure of this agreement. To be sure, the agreement provides that "matters which are strictly a function of management shall not be subject to arbitration." But it goes on to say that if "differences" arise or if "any local trouble of any kind" arises, the grievance procedure shall be applicable.

Collective bargaining agreements regulate or restrict the exercise of management functions; they do not oust management from the performance of them. Management hires and fires, pays and promotes, supervises and plans. All these are part of its function, and absent a collective bargaining agreement, it may be exercised freely except as limited by public law and by the willingness of employees to work under the particular, unilaterally imposed conditions. A collective bargaining agreement may treat only with certain specific practices, leaving the rest to management but subject to the possibility of work stoppages. When, however, an absolute no-strike clause is included in the agreement, then in a very real sense everything that management does is subject to the agreement, for either management is prohibited or limited in the action it takes, or if not, it is protected from interference by strikes. This comprehensive reach of the collective bargaining agreement does not mean,

---

[7] It is clear that under both the agreement in this case and that involved in *American Manufacturing Co., ante,* p. 564, the question of arbitrability is for the courts to decide. Cf. Cox, Reflections Upon Labor Arbitration, 72 Harv. L. Rev. 1482, 1508–1509. Where the assertion by the claimant is that the parties excluded from court determination not merely the decision of the merits of the grievance but also the question of its arbitrability, vesting power to make both decisions in the arbitrator, the claimant must bear the burden of a clear demonstration of that purpose.

however, that the language, "strictly a function of management," has no meaning.

"Strictly a function of management" might be thought to refer to any practice of management in which, under particular circumstances prescribed by the agreement, it is permitted to indulge. But if courts, in order to determine arbitrability, were allowed to determine what is permitted and what is not, the arbitration clause would be swallowed up by the exception. Every grievance in a sense involves a claim that management has violated some provision of the agreement.

Accordingly, "strictly a function of management" must be interpreted as referring only to that over which the contract gives management complete control and unfettered discretion. Respondent claims that the contracting out of work falls within this category. Contracting out work is the basis of many grievances; and that type of claim is grist in the mills of the arbitrators.[8] A specific collective bargaining agreement may exclude contracting out from the grievance procedure. Or a written collateral agreement may make clear that contracting out was not a matter for arbitration. In such a case a grievance based solely on contracting out would not be arbitrable. Here, however, there is no such provision. Nor is there any showing that the parties designed the phrase "strictly a function of management" to encompass any and all forms of contracting out. In the absence of any

---

[8] See *Celanese Corp. of America*, 33 Lab. Arb. Rep. 925, 941 (1959), where the arbiter in a grievance growing out of contracting out work said:

"In my research I have located 64 published decisions which have been concerned with this issue covering a wide range of factual situations but all of them with the common characteristic—i. e., the contracting-out of work involved occurred under an Agreement that contained no provision that specifically mentioned contracting-out of work."

express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad. Since any attempt by a court to infer such a purpose necessarily comprehends the merits, the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator.

The grievance alleged that the contracting out was a violation of the collective bargaining agreement. There was, therefore, a dispute "as to the meaning and application of the provisions of this Agreement" which the parties had agreed would be determined by arbitration.

The judiciary sits in these cases to bring into operation an arbitral process which substitutes a regime of peaceful settlement for the older regime of industrial conflict. Whether contracting out in the present case violated the agreement is the question. It is a question for the arbiter, not for the courts. *Reversed.*

Mr. Justice Frankfurter concurs in the result.

Mr. Justice Black took no part in the consideration or decision of this case.

[For opinion of Mr. Justice Brennan, joined by Mr. Justice Frankfurter and Mr. Justice Harlan, see *ante*, p. 569.]

Mr. Justice Whittaker, dissenting.

Until today, I have understood it to be the unquestioned law, as this Court has consistently held, that arbitrators are private judges chosen by the parties to decide

particular matters specifically submitted; [1] that the contract under which matters are submitted to arbitrators is at once the source and limit of their authority and power; [2] and that their power to decide issues with finality, thus ousting the normal functions of the courts, must rest upon a clear, definitive agreement of the parties, as such powers can never be implied. *United States* v. *Moorman,* 338 U. S. 457, 462; [3] *Mercantile Trust Co.* v. *Hensey,* 205 U. S. 298, 309.[4]   See also *Fernandez & Hnos.* v. *Rickert Rice Mills,* 119 F. 2d 809, 815 (C. A. 1st Cir.); [5] *Marchant* v. *Mead-Morrison Mfg. Co.,* 252 N. Y. 284, 299, 169 N. E. 386, 391; [6] *Continental Milling & Feed Co.*

---

[1] "Arbitrators are judges chosen by the parties to decide the matters submitted to them." *Burchell* v. *Marsh,* 17 How. 344, 349.

[2] "The agreement under which [the arbitrators] were selected *was at once the source and limit of their authority,* and the award, to be binding, must, in substance and form, conform to the submission." (Emphasis added.) *Continental Ins. Co.* v. *Garrett,* 125 F. 589, 590 (C. A. 6th Cir.)—Opinion by Judge, later Mr. Justice, Lurton.

[3] "It is true that *the intention of parties to submit their contractual disputes to final determination outside the courts should be made manifest by plain language.*" (Emphasis added.) *United States* v. *Moorman,* 338 U. S. 457, 462.

[4] "To make such [an arbitrator's] certificate conclusive *requires plain language in the contract.* It is not to be implied." (Emphasis added.) *Mercantile Trust Co.* v. *Hensey,* 205 U. S. 298, 309.

[5] "A party is never required to submit to arbitration any question which he has not agreed so to submit, and contracts providing for arbitration *will be carefully construed in order not to force a party to submit to arbitration a question which he did not intend to be submitted.*" (Emphasis added.) *Fernandez & Hnos.* v. *Rickert Rice Mills,* 119 F. 2d 809, 815 (C. A. 1st Cir.).

[6] In this leading case, Judge, later Mr. Justice, Cardozo said:

"The question is one of intention, to be ascertained by the same tests that are applied to contracts generally. . . .   No one is under a duty to resort to these conventional tribunals, however helpful their processes, *except to the extent that he has signified his willingness.*   Our own favor or disfavor of the cause of arbitration is not

v. *Doughnut Corp.,* 186 Md. 669, 676, 48 A. 2d 447, 450; [7]
*Jacob* v. *Weisser,* 207 Pa. 484, 489, 56 A. 1065, 1067.[8]   I
believe that the Court today departs from the established
principles announced in these decisions.

Here, the employer operates a shop for the normal
maintenance of its barges, but it is not equipped to make
major repairs, and accordingly the employer has, from the
beginning of its operations more than 19 years ago, con-
tracted out its major repair work.   During most, if not all,
of this time the union has represented the employees in
that unit.   The District Court found that "[t]hroughout
the successive labor agreements between these parties,
including the present one, . . . [the union] has unsuc-
cessfully sought to negotiate changes in the labor con-
tracts, and particularly during the negotiation of the
present labor agreement, . . . which would have limited

---

to count as a factor in the appraisal of the thought of others."
(Emphasis added.)   *Marchant* v. *Mead-Morrison Mfg. Co.,* 252 N. Y.
284, 299, 169 N. E. 386, 391.

[7] In this case, the Court, after quoting Judge Cardozo's language
in *Marchant, supra,* saying that "the question is one of intention,"
said:

"Sound policy demands that the terms of an arbitration agreement
*must not be strained to discover power to pass upon matters in dis-
pute, but the terms must be clear and unmistakable to oust the juris-
diction of the Court, for trial by jury cannot be taken away in any
case merely by implication."* (Emphasis added.)   *Continental Milling
& Feed Co.* v. *Doughnut Corp.,* 186 Md. 669, 676, 48 A. 447, 450.

[8] "But, under any circumstances, before the decision of an arbitrator
can be held final and conclusive, it must appear, as was said in
*Chandley Bros.* v. *Cambridge Springs,* 200 Pa. 230, 49 Atl. 772, *that
power to pass upon the subject-matter, is clearly given to him.   'The
terms of the agreement are not to be strained to discover it.   They
must be clear and unmistakable to oust the jurisdiction of the courts;
for trial by jury cannot be taken away by implication merely in any
case.'"* (Emphasis added.)   *Jacob* v. *Weisser,* 207 Pa. 484, 489, 56
A. 1065, 1067.

the right of the [employer] to continue the practice of contracting out such work." 168 F. Supp. 702, 704–705.

The labor agreement involved here provides for arbitration of disputes respecting the interpretation and application of the agreement and, arguably, also some other things. But the first paragraph of the arbitration section says: "[M]atters which are strictly a function of management shall not be subject to arbitration under this section." Although acquiescing for 19 years in the employer's interpretation that contracting out work was "strictly a function of management," and having repeatedly tried—particularly in the negotiation of the agreement involved here—but unsuccessfully, to induce the employer to agree to a covenant that would prohibit it from contracting out work, the union, after having agreed to and signed the contract involved, presented a "grievance" on the ground that the employer's contracting out work, at a time when some employees in the unit were laid off for lack of work, constituted a partial "lockout" of employees in violation of the antilockout provision of the agreement.

Being unable to persuade the employer to agree to cease contracting out work or to agree to arbitrate the "grievance," the union brought this action in the District Court, under § 301 of the Labor Management Relations Act, 29 U. S. C. § 185, for a decree compelling the employer to submit the "grievance" to arbitration. The District Court, holding that the contracting out of work was, and over a long course of dealings had been interpreted and understood by the parties to be, "strictly a function of management," and was therefore specifically excluded from arbitration by the terms of the contract, denied the relief prayed, 168 F. Supp. 702. The Court of Appeals affirmed, 269 F. 2d 633, and we granted certiorari. 361 U. S. 912.

The Court now reverses the judgment of the Court of Appeals. It holds that the arbitrator's source of law is "not confined to the express provisions of the contract," that arbitration should be ordered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," that "[d]oubts [of arbitrability] should be resolved in favor of coverage," and that when, as here, "an absolute no-strike clause is included in the agreement, then . . . everything that management does is subject to [arbitration]." I understand the Court thus to hold that the arbitrators are not confined to the express provisions of the contract, that arbitration is to be ordered unless it may be said with positive assurance that arbitration of a particular dispute is excluded by the contract, that doubts of arbitrability are to be resolved in favor of arbitration, and that when, as here, the contract contains a no-strike clause, everything that management does is subject to arbitration.

This is an entirely new and strange doctrine to me. I suggest, with deference, that it departs from both the contract of the parties and the controlling decisions of this Court. I find nothing in the contract that purports to confer upon arbitrators any such general breadth of private judicial power. The Court cites no legislative or judicial authority that creates for or gives to arbitrators such broad general powers. And I respectfully submit that today's decision cannot be squared with the statement of Judge, later Mr. Justice, Cardozo in *Marchant* that "No one is under a duty to resort to these conventional tribunals, however helpful their processes, *except to the extent that he has signified his willingness.* Our own favor or disfavor of the cause of arbitration is not to count as a factor in the appraisal of the thought of others" (emphasis added), 252 N. Y., at 299, 169 N. E., at 391; nor with his state-

ment in that case that "[t]he question is one of intention, to be ascertained by the same tests that are applied to contracts generally," *id.;* nor with this Court's statement in *Moorman,* "that the intention of the parties to submit their contractual disputes to final determination outside the courts *should be made manifest by plain language*" (emphasis added), 338 U. S., at 462; nor with this Court's statement in *Hensey* that: "To make such [an arbitrator's] certificate conclusive *requires plain language in the contract.* It is not to be implied." (Emphasis added.) 205 U. S., at 309. "A party is never required to submit to arbitration any question which he has not agreed so to submit, and *contracts providing for arbitration will be carefully construed in order not to force a party to submit to arbitration a question which he did not intend to be submitted.*" (Emphasis added.) *Fernandez & Hnos.* v. *Rickert Rice Mills, supra,* 119 F. 2d, at 815 (C. A. 1st Cir.).

With respect, I submit that there is nothing in the contract here to indicate that the employer "signified [its] willingness" (*Marchant, supra,* at 299) to submit to arbitrators whether it must cease contracting out work. Certainly no such intention is "made manifest by plain language" (*Moorman, supra,* at 462), as the law "requires," because such consent "is not to be implied." *Hensey, supra,* at 309.) To the contrary, the parties by their conduct over many years interpreted the contracting out of major repair work to be "strictly a function of management," and if, as the concurring opinion suggests, the words of the contract can "be understood only by reference to the background which gave rise to their inclusion," then the interpretation given by the parties over 19 years to the phrase "matters which are strictly a function of management" should logically have some significance here. By their contract, the parties agreed that "matters

which are strictly a function of management shall not be subject to arbitration." The union over the course of many years repeatedly tried to induce the employer to agree to a covenant prohibiting the contracting out of work, but was never successful. The union again made such an effort in negotiating the very contract involved here, and, failing of success, signed the contract, knowing, of course, that it did not contain any such covenant, but that, to the contrary, it contained, just as had the former contracts, a covenant that "matters which are strictly a function of management shall not be subject to arbitration." Does not this show that, instead of signifying a willingness to submit to arbitration the matter of whether the employer might continue to contract out work, the parties fairly agreed to exclude at least that matter from arbitration? Surely it cannot be said that the parties agreed to such a submission by any "plain language." *Moorman, supra,* at 462, and *Hensey, supra,* at 309. Does not then the Court's opinion compel the employer "to submit to arbitration [a] question which [it] has not agreed so to submit"? (*Fernandez & Hnos., supra,* at 815.)

Surely the question whether a particular subject or class of subjects is or is not made arbitrable by a contract is a judicial question, and if, as the concurring opinion suggests, "the court may conclude that [the contract] commits to arbitration any [subject or class of subjects]," it may likewise conclude that the contract does not commit such subject or class of subjects to arbitration, and "[w]ith that finding the court will have exhausted its function" no more nor less by denying arbitration than by ordering it. Here the District Court found, and the Court of Appeals approved its finding, that by the terms of the contract, as interpreted by the parties over 19 years, the contracting out of work was "strictly a function

of management" and "not subject to arbitration." That finding, I think, should be accepted here. Acceptance of it requires affirmance of the judgment.

I agree with the Court that courts have no proper concern with the "merits" of claims which by contract the parties have agreed to submit to the exclusive jurisdiction of arbitrators. But the question is one of jurisdiction. Neither may entrench upon the jurisdiction of the other. The test is: Did the parties in their contract "manifest by plain language" (*Moorman, supra,* at 462) their willingness to submit the issue in controversy to arbitrators? If they did, then the arbitrators have exclusive jurisdiction of it, and the courts, absent fraud or the like, must respect that exclusive jurisdiction and cannot interfere. But if they did not, then the courts must exercise their jurisdiction, when properly invoked, to protect the citizen against the attempted use by arbitrators of pretended powers actually never conferred. That question always is, and from its very nature must be, a judicial one. Such was the question presented to the District Court and the Court of Appeals here. They found the jurisdictional facts, properly applied the settled law to those facts, and correctly decided the case. I would therefore affirm the judgment.