**NEW ORLEANS STEAMSHIP ASSOCIATION**

v.

**GENERAL LONGSHORE WORKERS, I.L.A. LOCAL UNION #1418, an Unincorporated Association, and General Longshore Workers, I.L.A. Local Union #1419, an Unincorporated Association, AFL–CIO.**

**Civ. A. No. 69–2653.**

United States District Court
E. D. Louisiana,
New Orleans Division.
Nov. 8, 1969.

Andrew P. Carter, Chas. King Mallory, of Monroe & Lemann, New Orleans, La., for plaintiff.

Alvin J. Liska, of Liska, Exnicios & Nungesser, New Orleans, La., for defendant, Local Union #1418.

Victor H. Hess, New Orleans, La., for defendant, Local Union #1419.

## MEMORANDUM OF REASONS

COMISKEY, District Judge.

The plaintiff is the New Orleans Steamship Association which represents various steamship companies and stevedoring companies, including T. Smith & Son, Inc. and Central Gulf Steamship Corporation. The defendants are the two general longshore workers I.L.A. Local Unions #1418 and #1419, whose membership consists of the longshoremen for the waterfront labor for the Port of New Orleans. The plaintiff and the defend-ants, after collective bargaining, executed a Deep Sea Agreement effective October 1, 1968, which expires on September 30, 1971. The Agreement sets out a comprehensive collective bargaining contract between the parties to regulate working conditions, wages, duties, hours, and other aspects of the labor-management relationship. Principally, the two paragraphs of this agreement with which we are concerned in this suit are Article XVII, entitled "NO STRIKES, NO LOCKOUTS—DISPUTES AND ARBITRATION," and Article IV(a), entitled "JURISDICTIONAL GUIDELINES."

On October 30, 1969, the plaintiff ordered its member T. Smith & Son, Inc. to have a longshoremen gang at the wharves of the Port of New Orleans at 8:00 A.M. to assist in the loading of the vessel M/V ACADIA FOREST, of which Central Gulf Steamship Corporation was the time charterer. The longshore gang of T. Smith & Son, Inc. appeared at the wharves adjacent to the vessel, but refused to go aboard the ship on the instructions of the presidents of the two defendant labor unions. Thereafter, the plaintiff sought and obtained arbitration on the contractual legality of this work stoppage under Article XVII; and after a hearing before an arbitrator an award was made, finding the defendant labor unions in violation of the Deep Sea Agreement and ordering them to cease and desist from continuing this work stoppage. The defendants refused to cease and desist, and the plaintiff filed this suit for injunctive relief under 29 U.S.C. § 185(a), which provides for federal jurisdiction in suits for violations of contracts between employers and labor organizations wtihout respect to any amount in controversy or without regard to the citizenship of the parties.

The plaintiffs seek a mandatory injunction to compel the defendants to terminate this work stoppage and in effect for specific performance of the work obligations under the Deep Sea Agreement. The defendants answered, contending that the plaintiffs were not entitled to such injunctive relief. This vessel is

commonly referred to as a LASH type vessel, and apparently this is the first time in the history of the Port of New Orleans that a LASH type vessel has ever come to our wharves. This LASH type vessel differs from a regular cargo vessel and has some of the following specifications. The vessel is 43,000 tons, 860 feet long and 107 feet wide. This vessel does not have the traditional holds and hatches into which cargo is loaded from the adjacent wharves or from barges moored alongside in the water. Rather, this ship normally carries aboard it 73 separate barges (it is actually capable of holding 80 barges), each of which is loaded with cargo. While the normal capacity of a traditional freighter is approximately 10,000 tons, the LASH type vessel carries about 29,000 tons. The traditional freighter with a normal cargo capacity uses an average of four or five gangs, each of which consists of eighteen men, who consume three 24-hour days to complete the loading operations. On the other hand, a LASH type vessel uses only one gang, consisting of fourteen men, to complete the loading operation in 24 to 36 hours. The defendants contend that the Deep Sea Agreement which defines "cargo" in Article IV on page six and "longshore labor" on page 7, does not include the longshore labor ordered by the plaintiff, nor does it include such longshore labor to work with the type of "cargo" carried by this LASH type vessel. Accordingly, the defendants contend that they have no obligation to provide any longshore labor to load this cargo under the collective bargaining agreement. They further argue that the arbitrator's actions in presiding over the case, in making findings, and in issuing an award with a cease and desist order was outside of his jurisdiction, because the subject matter of the dispute is in no way covered by the Deep Sea Agreement. The defendants rely principally upon the following paragraph from Article XVII(c) of the Agreement, which reads as follows:

"The arbitrator's authority shall be limited to interpretation and applica-tion of the terms of this agreement * * *. The arbitrator shall have no authority to render decisions which have the effect of adding to, subtracting from, or otherwise modifying the terms of this agreement."

The defendants also base their position on the following two paragraphs from Article IV, which read as follows:

"Wherever the term 'cargo' is used herein it includes, but is not limited to, break bulk, containerized, unitized and prepalletized cargo, as well as trucks, automobiles and tractors. Wherever the term 'container(s)' is used herein it shall mean containers which are (20) feet or more in length.

\* \* \* \* \* \*

"A. Longshore Work—Locals 1418 and 1419

1. Longshore labor includes all men who move cargo direct from the point of rest on the wharf or from a rail car to shipside or ship's hatches (and vice versa), as well as men who work cargo direct from barges to ship (and vice versa). It also includes the fitting of ships for grain, livestock and explosives, shoring of cargo aboard vessels, loading, unloading and sacking of grain in bulk aboard vessels."

There are three Supreme Court decisions treating on this subject, commonly referred to as the "Steel Workers Trilogy". United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior and Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. These cases recognize that to avoid industrial strife, collective bargaining agreements include arbitration clauses to resolve the differences between labor and management rapidly, inexpensively, and without resort to litigation. In exchange for no strike, no work stoppage and no lock out agreements, the parties deliver their dif-

ferences to an arbitration procedure and thereby preserve industrial peace with the least amount of discord. However, in approving such an arbitration procedure, the United States Supreme Court recognized the limited judicial review still available to the parties. In *Warrior and Gulf Navigation Co., supra,* the Court said:

> "The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." 363 U.S. at 582–583, 80 S.Ct. at 1353.

Despite the restrictive language in the foregoing quotation, the Supreme Court also declared that there is a legitimate area of judicial review available to a complaining party when the question arises as to whether or not the arbitrator's decision was truly interpretive of the contract or if, in fact and in law, the arbitrator's decision went outside the contract or, in effect resulted in an addition to, a subtraction from, or a modification of the terms of the collective bargaining agreement. This point was made in *Enterprise Wheel & Car Corp., supra,* as follows:

> "Nevertheless, an arbitrator is confined to interpretation and application

of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." 363 U.S. at 597, 80 S.Ct. at 1361.

In this circuit, in Gulf & South American Steamship Co. v. National Maritime Union, 360 F.2d 63 (5th Cir. 1966), the court cited *Enterprise Wheel & Car Corp.* and held that arbitration is limited to the immediate subject matter of the bargaining agreement when it said:

> "The power of the arbitrator lies in the subject matter being drawn from the agreement to arbitrate, and absent such power or jurisdiction, there may be no judicial enforcement. United Steelworkers of America v. Enterprise Wheel & Car Corp., supra, 363 U.S. 593, 597, 80 S.Ct. 1358; Cf. Minute Maid Company v. Citrus, Cannery, Food Processing and Allied Workers, Drivers, Warehousemen and Helpers, Local Union No. 444, 5 Cir., 1964, 331 F.2d 280."

The plaintiff's counsel relies heavily on New Orleans Steamship Association v. General Longshore Workers, 389 F.2d 369 (5th Cir. 1968), which incidentally involved the same parties who are before the Court in this case. In that case the Fifth Circuit enforced an arbitrator's award by mandatorily enjoining union members to halt a work stoppage. The Court found this injunctive relief not inconsistent with the Norris-LaGuardia Act, 29 U.S.C. § 104, reasoning that what the Court was really granting was specific performance of the collective bargaining agreement entered into by said parties. In this case the Court found that the arbitrator clearly had authority over the subject matter which constituted the dispute between the parties and therefore distinguished it from *Gulf and South American Steamship Co.* on the

**138**

ground that in the latter case "the arbitrator exceeded his jurisdiction in making the award and thus there could be no judicial enforcement of the award." 389 F.2d at 371. The court recognized the right and power of an award made by an arbitrator only when he acts within his jurisdiction under the contract.

In the instant case, Article IV(a) which defines the "cargo" that the defendants must handle, omits any reference to LASH cargo. While this article lists seriatim four types of special cargo, it noticeably omits one of the most special types of cargo in the history of the Port of New Orleans, namely, LASH cargo. True, the contract indicates that the term cargo "is not limited to" these four special types of cargo, but to assume the inclusion of this very unique LASH cargo when it is not even mentioned assumes too much for this Court. The evidence in this case shows that during the negotiations leading up to this Agreement there were vigorous and hotly contested disputes over whether containerized cargo should be included in this Agreement. As a result of its final inclusion in the contract, a special Interpretive Memorandum along with Rules on Containers and a section on Container Royalty were incorporated into the contract because of the fact that containerized cargo substantially reduces the need for longshore labor in handling such cargo. Since the LASH type vessel is even more revolutionary as a labor saving device, we must conclude that the parties to this Agreement never intended to include LASH type cargo by the words "not limited to". Certainly LASH type cargo would have been the subject of special mention and special treatment which is absent from this agreement. Article IV(a) of the Deep Sea Agreement also meticulously defines "longshore labor", and a reading of this section convinces this Court that the "longshore labor" intended under this Agreement always envisioned the traditional type of longshore labor and not the lifting of 500 ton loaded barges from the water and placing them aboard the LASH vessel.

The pertinent part of this section reads as follows:

"Longshore labor includes all men who move cargo direct from the point of rest on the wharf or from a rail car to shipside of ship's hatches (and vice versa), as well as men who work cargo direct from barge to ship (and vice versa)."

Nothing in this section can be said to include "longshore labor" which consists of lifting cargo-laden barges directly from the water onto the ship. We conclude that the arbitration and the award concerned itself with a subject matter not covered by the Agreement and outside the jurisdiction of the arbitrator. The award is therefore unenforceable. Gulf & South American Steamship Co., Enterprise Wheel & Car Corp., *supra.* Accordingly, the plaintiff's request for a temporary restraining order, preliminary and permanent injunction is denied. The Clerk will prepare a judgment.