Katherine M. FERRICK, Appellant,

v.

**BALTIMORE AND OHIO RAILROAD COMPANY and Chesapeake and Ohio Railroad Company.**

No. 19254.

United States Court of Appeals, Third Circuit.

Argued June 7, 1971.

Decided July 12, 1971.

Peter J. Mansmann, Mansmann, Beggy, McVerry & Baxter, Pittsburgh, Pa., for appellant.

Albert W. Laisy, Baltimore, Md. (John J. Repcheck, Pittsburgh, Pa., on the brief), for appellees.

Before STALEY, ADAMS, Circuit Judges, and GARTH, District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this case we are asked to rule that the District Judge erred in refusing to review an arbitration award challenged as being illegal because it was contrary to the provisions of the ICC ruling governing the proceedings, it was inconsistent with the facts as found by the arbitration committee, and it was incomplete, ambiguous, and capricious.

For the 21 years prior to the events giving rise to this litigation, the appellant, Miss Ferrick, was employed in the Regional Office of the Engineering Department of the Baltimore and Ohio Railroad Company (B & O), in Pittsburgh, Pennsylvania. As secretary to the Assistant Regional Engineer, she earned a monthly salary of $559. Because this was an "excepted" position, Miss Ferrick was not a member of the Brotherhood of Railroad Employees.

In 1962, the Chesapeake and Ohio Railroad Company (C & O) sought control of the B & O. The control agreement was approved by the Interstate Commerce Commission in Chesapeake & O. Ry.-Control-Baltimore & O.R.R., 317 ICC 261 (1962). Appendix VIII to that decision [hereafter referred to as Control Conditions] specified certain "conditions for the benefit of employees of carriers."[1] Soon after C & O announced the proposed take-over, B & O eliminated its Regional Engineering Office in Pittsburgh and abolished Miss Ferrick's position. Shortly thereafter, her employment was terminated.

Prior to the termination, appellant sought other employment from B & O. However, she made it clear to those to whom she spoke that she was not interested in working for the department

---

1. 317 ICC at 346.

that was instrumental in abolishing her position, and that she would not accept employment paying under $500 per month. Furthermore, she maintained she was not required to transfer from Pittsburgh to another city in order to avoid forfeiture of her benefits.

When these negotiations foundered, appellant attempted to secure her protective benefits by arbitration under article I, section 6 of the Control Conditions. Because the parties could not agree upon a neutral member of the arbitration committee, they requested Judge Miller to make the selection.[2] After the appointment of a member of the University of Pittsburgh law faculty as the neutral arbitrator, a hearing was held, and on June 10, 1966, the arbitration committee announced its report.

The arbitration committee found that because the abolition of appellant's position was a result of the transaction between B & O and C & O, Miss Ferrick derived her rights from the Control Conditions. The committee determined she was a "dismissed" employee and was therefore entitled to benefits of $59 per month for the duration of the protective period. This figure was arrived at by subtracting from her 1963 salary ($559 per month) the amount of the salary of the job she refused ($500 per month).[3]

The committee also decided that Miss Ferrick could derive no benefits from the Agreement of May, 1936 (Washington Agreement), because article II of the Control Conditions applied only to union personnel.

Miss Ferrick then appealed to the National Railroad Adjustment Board.[4] That Board found that it had jurisdiction over the dispute, but dismissed the claim because the Control Conditions provided that the arbitration would be "final, binding, and conclusive."[5]

Appellant next filed a complaint in the District Court for the Western District of Pennsylvania, asking for a declaration of her rights and reformation of the award. In ruling on defendants' motions for summary judgment, Judge Miller found that the case involved no genuine issue of material fact and that Miss Ferrick's assertions were, as a matter of law, without merit.

In Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3rd Cir. 1969), we carefully considered the issue of the proper scope of judicial review of arbitration awards. Particular emphasis was placed upon the appropriate standard which courts should apply. After reviewing leading state and federal cases, including the *Steelworkers* trilogy,[6]

2. Section 6 allowed the parties to agree upon a method by which the neutral member could be chosen if they could not agree upon the appointment itself. 317 ICC at 346.

3. Between the hearing and the issuance of the report, appellant was rehired by the B & O in Pittsburgh at a lower salary. Nevertheless, the protective period continued from December, 1963, until March, 1966, when appellant's salary again reached, and indeed exceeded, $559 per month. The gross award totalled $1,583.48. From this, Federal and city taxes of $340.45 were withheld. The railroad, pursuant to 45 U.S.C. § 352(f) (1964) and 26 U.S.C. § 3201 (1964), also withheld $995.53 as reimbursement to the Railroad Retirement Board for unemployment benefits which Miss Ferrick received. Accordingly, the net award amounted to only $247.50.

4. At this time, she charged that the arbitration committee failed to delineate her rights to certain fringe benefits in view of her subsequent reemployment by B & O.

5. In Local 616, Int'l Union of Electrical, Radio and Machine Workers v. Byrd Plastics, Inc., 428 F.2d 23 (3rd Cir. 1970), we examined a similar "final and binding" clause in a collective bargaining agreement, and held that unless the agreement specifically states "that it intends any dismissal * * * to bar further arbitration * * * it does not oust a second arbitrator of jurisdiction." We need not pass on what avenues, if any, remain open to appellant for pursuit of remedies for grievances which matured as a result of her reemployment.

6. United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S.

with regard to both commercial and labor arbitration, and the differences in the policies which underlie each, we concluded:

"Bearing this in mind and perceiving that the Supreme Court's announced standards in reviewing commercial awards call for the exercise of judicial restraint, we must conclude that such a philosophy of restricted review compels even less judicial interference in matters arising from labor arbitration. At the very least this means that the interpretation of labor arbitrators must not be disturbed so long as they are not in 'manifest disregard' [Wilko v. Swan, 346 U.S. 427, 436, 74 S.Ct. 182, 98 L. Ed. 168 (1953)] of the law, and that 'whether the arbitrators misconstrued a contract' does not open the award to judicial review. [Bernhardt v. Polygraphic Co. of America, Inc., 350 U.S. 198, 203, 76 S.Ct. 273, 100 L.Ed. 199 (1955)].

"Accordingly, we hold that a labor arbitrator's award does 'draw its essence from the collective bargaining agreement' [United Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)] if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the

law of the shop, may a reviewing court disturb the award." 405 F.2d at 1128 (footnotes omitted).

■ In this case, however, there is no collective bargaining agreement upon which the arbitration is based. Rather, its foundation consists of the conditions imposed by the ICC upon the railroads in order to insure "a fair and equitable arrangement for protecting the interests of the employees of the applicant [C & O] and the B & O and any of their subsidiaries who may be adversely affected as a result of the transaction herein approved. * * * *" 317 ICC at 289. Various proposals were considered by the Commission, *Id.*, at 286–89, before arriving at the conclusion that the Control Conditions, as fashioned for this transaction, would "more than meet the minimum requirements of section 5(2) (f)."[7] It is abundantly clear that the underlying purpose of the Control Conditions is the same as that of a collective bargaining agreement, and that the conditions were intended to supplement whatever agreements were then in force.[8] We conclude, therefore, that the principles enunciated in Ludwig Honold Mfg. Co. v. Fletcher, *supra,* should be as fully applicable to arbitrations based upon the Control Conditions, as to arbitrations based upon collective bargaining agreements.

Our task under *Ludwig Honold Mfg. Co.* is somewhat limited. We may disturb the award only where it is in "manifest disregard of the [control] agreement, totally unsupported by principles of contract construction" or where it is

---

593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. America Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

7. 49 U.S.C. § 5(2) (a) (f) (1964). It is important to note that the Commission considered and rejected the application of "attrition conditions" under which no employee could be deprived of employment or placed in a worse condition with respect to compensation at any time during

his employment as a result of the transaction. 317 ICC at 286–287. This is essentially the relief which appellant requested.

8. "It is observed that many of the provisions specifically requested by the [Railway Labor Executives'] [A]ssociation are similar to, or based upon language used in the Washington Agreement. Of course, to the extent that the Washington Agreement becomes applicable, the terms and conditions thereof will apply." 317 ICC at 288.

"too vague and ambiguous for enforcement * * *."[9] Accordingly, we must review the action of the District Court and Miss Ferrick's assertions of error with that admonition in mind.

Appellant bases her argument that the award is ambiguous, arbitrary and confusing on the fact that the arbitration committee report specifically found that her status at the time of the hearing was that of a "dismissed" employee[10] whereas the award spoke in terms of the "date of her furlough" and the "period of her furlough." We agree with the District Court that these contentions are without merit. Miss Ferrick's employment record with B & O, at the time of the arbitration hearing, showed her to be "furloughed." It is clear that the use of the word "furlough" in the first sentence of the award merely referred to the date which marked the beginning of the protective period, i.e., December 20, 1963. Similarly, the phrase "period of furlough" in the last sentence of the award is used synonymously with "protective period."

Appellant also attacks the award as being undetermined and incomplete in its essential terms because it did not specify the termination date of the protective period or the credits which B & O could take against it. These contentions are also without merit. Section 1(e) of article I of the Control Conditions precisely defines the length of the protective period. The award is based upon the finding that at the time of the hearing Miss Ferrick's status was that of a "dismissed" employee. This, however, did not preclude appellant from subsequently altering her status by returning to the employ of B & O.

The provision in the award with respect to credits is equally clear. Both sections 3(b) [dismissal allowances] and 2(a) [displacement allowances] of the Control Conditions provide that the amount of the allowance is determined in relation to the income of the aggrieved person. In attempting to deal equitably with Miss Ferrick, considering the truncated nature of the award, the committee was insuring that her benefits would not be further reduced if her earnings rose above $500 per month. B & O, in fact, made no deductions except those required by statute, viz., taxes and reimbursement to the Railroad Retirement Board for unemployment benefits received by Miss Ferrick.[11]

Appellant's major argument is that the arbitration committee's decision in this case "wounds the essence of the ICC decision under which the arbitration was held." She bases this upon two contentions: (1) that the B & O was required to pay her $559 per month, and therefore she was justified in refusing to relocate at a salary of $500 per month; and (2) that she was entitled to the benefit of the provisions of the Washington Agreement. If the arbitration committee's action "can in any rational way be derived from the [Control Conditions],"[12] then courts may not disturb the award, and the District Court was correct in granting defendant's motion for summary judgment.

The gist of appellant's position is that she was entitled to employment by B & O in Pittsburgh at a rate of compensation equal to or in excess of $500 per month. This absolute approach to the protection of employees was rejected by the Commission in favor of a plan which would be fair and equitable.[13] The essence of an equitable arrangement is that both sides should be protected from unreasonable burdens. In

---

9. 405 F.2d at 1128 and n. 27.

10. The Control Conditions define a dismissed employee as one who is deprived of employment or whose position is abolished as a result of the transaction. Art. I, § 1(d), 317 ICC at 346. A displaced employee is one who is placed in a worse position with respect to compensation or

work rules. Id., § 1(c). The term "furloughed employee" is not defined.

11. See note 3, supra.

12. Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3rd Cir. 1969).

13. See note 7, and accompanying text, supra.

furtherance of this goal, the Commission provided for the cessation of the dismissal allowance "in the event of the failure of the employee without good cause to return to service after being notified by the carriers of a position, the duties of which he is qualified to perform and for which he is eligible. \* \* \* " Control Conditions, art. I, § 3(c), 317 ICC at 347. Furthermore, the Control Conditions specifically provide that the carriers must pay the moving expenses of "[a]ny employee retained in the service of the carrier or who is later restored to service after being entitled to receive a dismissal allowance, and who is required to change the point of his employment as a result of the transaction, and within the protective period is required to move his place of residence. \* \* \* " Art. I, § 5, 317 ICC at 347. Because the Control Conditions provide for a displacement allowance, moving expenses, and termination of benefits for refusal to return to work, the conclusion of the arbitration committee can be supported on the basis that the Control Conditions contemplate situations where employees will be required either to relocate, accept less money, or both. Nowhere in the Control Conditions can appellant find direct authority for her position.

Therefore, if manifest disregard for the document giving rise to the arbitration is to be found, it must reside in the determination by the committee that the Washington Agreement was inapplicable because appellant was not a union member.[14] Article II of the Control Conditions provides that affected employees may receive, in addition to the considerations enumerated in article I, benefits under the Washington Agreement. Section 3 of that article provides that any disputes arising with respect to the Washington Agreement benefits

shall be submitted to arbitration in accordance with the Control Conditions.

However, the language of the ICC in explaining the application of article II is equivocal at best, *see* 317 ICC at 288, and will support either position. In addition, the committee found further support for its position in the language of the Washington Agreement itself. Therefore, we cannot conclude that the arbitrators were faithless to the document which gave rise to their powers.

The order of the District Court will be affirmed.

---

14. "The Chairman interprets Article II of [the Control Conditions] as applicable to union personnel under the Washington Agreement, and only union personnel. It appears obvious that the purpose of Article II was to insure an employee under the Washington Agreement that his rights under that agreement could not be diminished by virtue of the Control [Conditions]. Therefore, to the extent that the Control [Conditions] would deprive him of the *quantum* of benefits he would receive under the Washington Agreement, he receives what he would have received under the Washington Agreement." Arbitration Committee Report, June 10, 1966.