**INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL–CIO, LOCAL LODGE NO. 347**

v.

**TRAILMOBILE, a Division of Pullman, Inc.**

**Civ. A. No. 72–2496.**

United States District Court, E. D. Pennsylvania.

April 4, 1973.

Louis H. Wilderman of Meranze, Katz, Spear & Bielitsky, Philadelphia, Pa., for plaintiff.

John B. Nason, of Kleinbard, Bell & Brecker, Philadelphia, Pa., for defendant; Mathew E. Murray, Anthony J. Crement, of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel.

HIGGINBOTHAM, District Judge.

### OPINION

The above-captioned case is here pursuant to § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185,[1] on

1. § 301, 29 U.S.C. § 185 provides in relevant part:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any dis-

cross-motions for summary judgment wherein the plaintiff, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO, Local Lodge No. 347 (hereinafter "Boilermakers") is seeking enforcement of an arbitrator's award, while the defendant, Trailmobile, contends that the arbitrator has exceeded his contractual authority and that enforcement must be denied. For the reasons which appear below, I hold that the plaintiff's motion for summary judgment must be granted and the arbitrator's award enforced.

On April 4, 1972, shortly after the lunch break, a group of employees of the defendant, Trailmobile, assembled to voice their concern over the denial of wage payments for the previous day because of a power failure at the plant. After hearing of management's refusal to pay for the time lost, a small group of employees moved toward the main gate of the plant. Soon, all the employees followed and a general work stoppage ensued which lasted for two days until April 6, 1972. After the Company's investigation, ten men were discharged and two were suspended for sixty days. Pursuant to Articles XV § 3 [2] and XVI [3] of the collective bargaining agreement between the Union and management, the Union sought review of the Company's decision to discipline these employees. The Arbitrator, John Perry Horlacher, in a thorough and well-reasoned opinion, sustained the company's decision as to six employees, but ordered reinstatement with full back pay for six others.

The law is clear both from the "Steelworkers Trilogy" [4] and several decisions [5] of the Third Circuit that the national labor policy of this nation favors the resolution of labor disputes by arbitration and severely limits the reviewing role of the District Court.

As the Supreme Court noted in United Steelworkers of America v. American Manufacturing Company, 363 U.S. 564, 567–568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960):

"The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract."

In another of the "Trilogy" cases, the Supreme Court further limited the appropriate role of the judiciary in reviewing arbitrator's awards to the following:

"The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards.

\*   \*   \*   \*   \*   \*

"[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, *yet his award is legitimate only so*

---

trict court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

2. See p. 538 and n. 6, *infra*.

3. See n. 7, *infra*.

4. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409

(1960); United Steelworkers of America v. Enterprise Wheel and Car Co., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

5. Gateway Coal Co. v. United Mineworkers of America, 466 F.2d 1157 (3d Cir. 1972); Local 616, Int'l Union of Elec. Workers, 428 F.2d 23 (3d Cir. 1970); Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3d Cir. 1969); H. K. Porter Co. v. United Saw, File and Steel Products Workers of America, 333 F.2d 596 (3d Cir. 1964).

*long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." (Emphasis added.) United Steelworkers of America v. Enterprise Wheel and Car Co., 363 U.S. 593, 596–597, 80 S.Ct. 1358, 1360–1361, 4 L.Ed.2d 1424 (1960).

To make the exact nature of the District Court' restricted role even more precise, our Circuit has carefully delineated the standard of whether an arbitrator's award "draws its essence" from the contract as follows:

"[A] labor arbitrator's award does 'draw its essence from the collective bargaining agreement' if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award." Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123, 1128 (3d Cir. 1969).

Thus, the preliminary, and in fact only, inquiry for this Court is the scope of the arbitrator's authority under the collective bargaining agreement here in issue in order to determine whether or not the award "draws its essence" from the agreement.

Examination of the language of the arbitration clauses of the agreement[6] must begin with Article XV, § 3, which provides:

". . . The arbitrator shall have no power to add or subtract from or change or modify or amend any of the terms or provisions of this Agreement or any other written agreements between the parties, nor shall he have any authority to hear or determine any dispute involving the exercise of a management function which is within the authority of the Company as set forth in Section 1 of Article III. All decisions of the arbitrator made within the authority of the arbitrator as defined in this Agreement shall be final and binding on the Company, the Union, and the employees covered by this Agreement."

However, with regard to disputes arising under Article XVI[7] of the Agree-

---

6. Agreement between Trailmobile, a Division of Pullman, Inc., and International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local Lodge No. 347, AFL-CIO, Article XV, § 3 (Effective May 19, 1969–May 18, 1972) [hereinafter referred to as "Agreement"].

7. Article XVI provides:
   "ARTICLE XVI—STRIKES AND LOCKOUTS
   "Section 1. The Company agrees that during the term of this Agreement it will not engage in any lockout of its employees in whole or in part.
   "Section 2. During the term of this Agreement the employees covered hereby shall not engage in or engage in or encourage or sanction any strike, sitdown, picketing, bannering, boycott or any other action which will interrupt or interfere with the operations of the Company. The Union agrees that during the term of this Agreement neither it nor its officers or agents will engage in or encourage or

sanction any strike, sitdown, picketing, bannering, boycott or any other action which will interrupt or interfere with the operations of the Company. In the event of any violation of this Article, the Union agrees that, upon telegraphic notification by the Company to it, it will take immediate affirmative steps with the employees concerned to bring about an immediate resumption of the normal operations of the Company.
   "Section 3. It is further agreed that in the event of iny unauthorized violation of this Article, the Company may discharge or otherwise discipline any employee (whether individually or in a group) who has violated this Article. In such event an employee who has been discharged or otherwise disciplined may file a grievance under the grievance provisions of this Agreement. If the grievance is not resolved in this grievance procedure, it may be submitted to arbitration; provided, however, that the arbitrator's decision shall be limited to the question of whether or not the ag-

ment, concerning ". . . any action which will interrupt or interfere with the operations of the company," the parties have agreed to restrict the arbitrator's authority to a decision ". . . whether or not the aggrieved employee violated the provisions of [the] Article . . ."[8] Accordingly, the instant award reinstating six of the twelve discharged employees can be enforced by this Court only if the sole basis of the reinstatement order was a finding of nonviolation of the Article XVI. A brief review of the facts of the instant case and the arbitrator's written opinion is here necessary.

The arbitrator concluded that the *company* found each of the disciplined employees to have violated Article XVI.[9] It is clear that an examination of Article XVI limiting the arbitrator's authority to a finding *vel non* of violation must include the power to define precisely what constitutes conduct rising to the level of breach of the no strike clause (Article XVI). The facts are here clear that a general, two-day, walkout occurred at the plant. It is further undisputed that the twelve employees who were disciplined by the company were in the initial group to leave the plant. In addition, six of the employees in the initial group who were disciplined did nothing other than walk out, while six others in the group were observed to have been stopping cars, shouting, making arm motions, etc.[10] Finally, the arbitrator found that there were other employees in the initial group who could have been identified and thus disciplined. The arbitrator's rationale focused *sub silentio* on what was a "violation" of Article XVI; for he considered several alternative definitions: First, the company could have defined "violation" as mere participation in the general walk-out and therefore disciplined all of its workers. Secondly, the company could have defined "violation" as being in the "initial group" and therefore disciplined all who were in that group. Thirdly, the company could have defined "violation" as something more than mere presence in the "initial group" and therefore disciplined only those six men whose conduct in fact exceeded mere presence. However, the arbitrator found that regardless of which definition of "violation" the company had employed, its actions could not be squared with any. First, the company did not discipline everyone, and therefore the arbitrator found the company to have rejected the broad standard of violation of having merely participated in the general walkout. Secondly, the company as noted above did *not* discipline everyone in the "initial group" and therefore it must have rejected that standard. Finally, while the company *did* discipline all employees whose conduct exceeded that of mere presence in the "initial group," the company also disciplined *some, but not all* employees, whose conduct rose no higher than mere presence in the initial group. Thus, in making what was a proper inquiry into the definition of "violation," the arbitrator concluded that the only rational definition in light of whom the company in fact disciplined was that a "violation" was not mere presence in the initial group, but rather was presence coupled with other actions. Accordingly, he then applied that definition of violation to the facts and ordered reinstatement of the six employees in question. As the arbitrator noted:

"Of course the Company enjoys discretion under the terms of Article XVI, § 3, but this discretion is not absolute. It cannot be abused by a

---

grieved employee violated the provisions of this Article, and he shall have no authority to modify the disciplinary action unless it is found that the employee has not violated any of the provisions of this Article."

8. See n. 7, *supra*, for the full text of Article XVI, § 3.

9. Opinion or Arbitrator, Exhibit B to Complaint (Document No. 1, p. 3. (Hereinafter cited as "Arbitrator's Opinion.")

10. Arbitrator's Opinion, pp. 11–12.

course of discipline that is palpably discriminatory, and is then sought to be excused because it was discretionary." Arbitrator's Opinion, p. 5.

Thus, here, where the Arbitrator has properly exercised his power to maintain a system of "industrial self-government",[11] I cannot exceed my limited authority as a Court to determine only whether the parties "did agree . . . to give the arbitrator power to make the award he made."[12] For all of the above reasons, I hold that the award does "draw its essence" from the contract, is within the arbitrator's power, and thus must be enforced.[13]

---

11. United Steelworkers of America v. Warrior & Gulf Navigation Company, 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L. Ed.2d 1409 (1960).

12. Id. at 582, 80 S.Ct. at 1353.

13. This Opinion is filed pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and constitutes the required findings of fact and conclusions of law.