**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, et al.**

Civ. A. No. 75–3324–F.

United States District Court, D. Massachusetts.

Oct. 14, 1975.

Edward R. Lev and Edward Woll, Jr., Sullivan & Worcester, Boston, Mass., for plaintiff.

Richard M. Reilly, Boston, Mass., for defendant American Arbitration.

James O. Hall (for Local Unions).

Warren H. Pyle, for International Union, Angoff, Goldman, Manning, Pyle & Wanger, Boston, Mass.

Elihu I. Leifer, Washington, D. C., for defendant Int'l Brotherhood Electrical Workers.

## OPINION

FREEDMAN, District Judge.

This matter is before the Court on the complaint of New England Telephone and Telegraph Company ("Company") seeking injunctive relief against the American Arbitration Association ("AAA"), the International Brotherhood

of Electrical Workers, AFL-CIO ("International") and several of its locals ("Union"). A hearing was held on September 3, 1975, on plaintiff's motion for preliminary injunction. The parties agreed to consolidate the hearing on the motion with the trial on the merits under Fed. R.Civ.P. 65(a)(2). After due consideration of the evidence, memoranda of counsel and the pertinent authorities, the Court hereinafter enters its findings and conclusions.

The action was brought by the Company under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to enjoin the Union from conduct allegedly violating the parties' collective bargaining agreement. The claimed violation involves the procedure for choosing neutral arbitrators. Plaintiff has also sued the AAA since it had, in essence, adopted the position of the Union.[1]

The Company and the Union have been parties to two labor agreements: the first was in effect from September 26, 1971 through July 31, 1974; the second and current agreement was signed on August 4, 1974, and will expire August 6, 1977. Prior to 1971 the employees were represented by the International Brotherhood of Telephone Workers under a labor agreement in force from September 2, 1968 to September 25, 1971.

There are three bargaining units representing the various locals which comprise defendant Union. The arbitrator selection clause is identical in all three contracts and is the same clause used in the 1971 agreement; it is set forth in full in the margin.[2] Under this provision only the Union can initiate arbitration proceedings; the Company does not retain that right under the agreement.

The general procedure followed by the parties and the AAA is a reasonably simple one. The Union files a Demand for Arbitration with the AAA, outlining the subject matter of the grievance. The AAA, within a day or two, submits an initial list of potential arbitrators (usually 7 names) to the parties. They are instructed to number the names in order of preference. If a party is opposed to one or more of the choices it may delete the name from the list. The cover letter indicates that the lists are to be returned within seven days.[3] If the parties are unable to agree on an arbitrator from the first list, the AAA sends out a second list of seven names; again, the process of numbering and deleting of unacceptable names takes place. If the parties are still unable to agree, the AAA sends out a third list with five, or sometimes three, names. At this point each party is to select three out of five names as acceptable (two names from a three-name list). In this way one name will be common to both lists and the choice of an arbitrator is assured. In an important grievance where there is still disagreement the AAA might send out a fourth or even fifth list.

The process of selection can be a time-consuming one. Both parties insist that the choice is crucial to the outcome of the grievance. Under the best of circumstances it is not unlikely that the 30-day period provided by Article 9.02(a) will be exceeded. *See* n. 2, *supra.*

The instant controversy arose when the Union began complaining of the Company's failure to return its lists of

---

1. At the hearing counsel for the AAA maintained a neutral position. AAA offered no evidence nor did it engage in examination of witnesses. To further demonstrate its neutrality, AAA filed neither a memorandum nor proposed findings and conclusions.

2. Article 9.02(a):
   From Arbitration lists supplied by the American Arbitration Association the parties shall choose the impartial chairman as soon as possible, but no later than 30 days from the date of the demand for arbitration. Thereafter, either party can request the American Arbitration Association to choose the impartial chairman.

3. This seven-day period is provided for in the Voluntary Labor Arbitration Rules ("VLAR") of AAA. Plaintiff maintains that it is not bound by these rules during the selection stages. The Court agrees, as will more fully appear in this opinion.

arbitrators. This omission by plaintiff was a contributing cause for the fact that at the time of the filing of the complaint the 30-day period for naming an arbitrator had been exceeded in 228 cases.[4] The Union had called upon the AAA to select arbitrators in those cases in which the 30-day period had expired and the AAA, after consultation with the parties, had agreed to do so. The Company charges that the AAA has exceeded its authority by so doing. Plaintiff claims that the Union and the AAA have misconstrued the arbitrator selection provision of the agreement. Further, it alleges that past practice between the parties establishes that the procedure followed by the Company does not violate the collective bargaining agreement. Finally, the Company contends that the Union by its conduct is estopped to assert the 30-day period.

The resolution of these questions requires a thorough understanding of the past practices of the parties.

The record provides little information as to the practices followed by the parties for the first year of the 1971 agreement. The Court infers that a sizable backlog had developed by October 1972 and that this resulted in the October 16, 1972 letter agreement. That agreement which by its terms expired with the then current collective bargaining agreement (July 31, 1974) provided that the Union "will have the sole discretion in determining the order in which the pending arbitration cases are scheduled." In return for this concession the Company was assured that no more than five non-discharge cases would be scheduled per month. The practical result of this agreement was that the Union maintained a priority list of those cases which it desired to be heard. The Company

would not return its initial arbitration list in a case until the Union indicated that it wanted that case heard.[5] The selection procedures were then carried out and the matter would be scheduled for hearing.

At some point in 1973, *see* n. 5, *supra,* the Union became aware that the Company was not returning the initial lists. The AAA was certainly aware of it, and by letter dated April 11, 1973, instructed the Company to return certain overdue lists. The Company complied on that occasion, but continued to hold initial lists as a general policy until the Union requested that the case be heard.

A new collective bargaining agreement was concluded on August 4, 1974. The same arbitrator selection clause appeared in this contract as appeared in the 1971 agreement; there was nothing in the new contract which continued the priority list arrangement of the October 1972 letter agreement.

Following the 1974 negotiations the Union became concerned about its backlog of arbitration cases. On September 24, 1974, Union attorney Warren Pyle wrote to the AAA demanding that it unilaterally appoint arbitrators in cases where the Company had failed to return its lists. Attorney McDonald replied for the plaintiff on October 3, 1974. In his letter he referred to the "practice" over the previous year of not returning lists until the Union had placed the case on the priority list. The practice was developed by the Company as a response to the "Union's filing an extraordinarily great number of arbitration cases over the last several years. . . ." He referred to the October 16, 1972, letter agreement, noting that it had expired the previous August.

4. There were other reasons for this failure—even if the lists were timely returned, it does not necessarily follow that the selections would have been completed within the prescribed 30 days.

5. The Company takes the position that it followed this procedure as soon as the Union

began to maintain the priority list. The Union claims that it became aware of the Company's failure to return the initial lists in the spring of 1973 (Affidavit of Patricia Cote, an officer of the Union) or late 1973 (Trial Testimony of Patricia Cote).

The thrust of McDonald's response was his contention that it would be a waste of effort to proceed with the appointment of arbitrators when the Union often withdrew cases prior to arbitration. He pointed out that an abandonment of the priority list arrangement would place the Company in a difficult situation. McDonald went on to say that if arbitrators were to be selected in all outstanding cases, the Company would exercise its right to have the cases heard in order of filing.

From the testimony of AAA Labor Tribunal Administrator Chandler it appears that after August 1974 the Union did not maintain a formal priority list, but did advise the AAA which cases it wanted heard. The Company would then be told to submit its selection list.

The Company adhered to its position that only in Union priority cases would it submit lists. This is clear from an exchange of letters between the AAA and the Company in November of last year. Ms. Chandler of the AAA wrote to Attorney McDonald on November 22 listing several cases for which lists were overdue and advised that if lists were not forthcoming within seven days, appointments would be made ". . . from preferences submitted." The Company's response was swift (November 25). It refused to submit lists for these non-discipline cases since they were not on the Union's priority list. The letter continued:

> . . . The Company will continue to furnish you its selection of arbitrators for discipline cases and those cases on the Union's priority list.
>
> As you know, this has been the practice of the Company and it will continue to be the practice until the parties reach some other agreement, such

as the scheduling of cases in the order of their filing.

This position apparently went unchallenged until May 1975.[6] Union attorney Pyle, by letter dated May 14, again protested the failure of the Company to return lists in timely fashion. He cited both the collective bargaining agreement and the AAA's Voluntary Labor Arbitration Rules. On June 19, 1975, the Union withdrew 258 pending cases and again demanded that arbitrators be selected in accordance with the Voluntary Labor Arbitration Rules. The reply of the AAA was to agree to process the cases and to inform the Company to submit all outstanding lists within seven days.

Company attorney McDonald responded on July 3, 1975, restating the Company's position that the practice since October 1972 had been to permit the Union to select which cases it wanted heard in return for the Union's acquiescence in the Company practice of not returning lists until the Union requested hearing. The AAA requested the Union's response; it replied that ". . . all cases should be processed forthwith."

The AAA then solicited the positions of the parties and advised the parties that it would decide how best to handle the matter. On August 7, 1975, the AAA began to appoint arbitrators[7] in cases where a period of 30 days had passed since the filing of the Demand for Arbitration. These appointments were made based upon the AAA's construction of the arbitrator selection provisions of the parties' collective bargaining agreement. See n. 2, *supra*.

This suit was filed by the Company on August 11, 1975, four days after the AAA began its unilateral appointment of arbitrators. Nineteen such appointments have now been made.

6. The Union's *Proposed Findings of Fact* states: "The Union thereafter continued to protest the Company's failure to return lists, verbally and in writing, both to AAA and the Company. . . ." There is nothing in the record between the Company's November 22, 1974 letter and the Union's May 14, 1975 letter which would support this statement.

7. Some of these arbitrators had not appeared on lists which had been sent to the parties.

*Construction of Article 9.02*

█ Plaintiff relies heavily upon the doctrine of past practices under the agreement to sustain its position as to the construction of Article 9.02. It is a familiar doctrine in this area of the law. Collective bargaining agreements cannot be expected to provide for every aspect of the ongoing relations between company and union. *See,* generally, Cox, *Reflections Upon Labor Arbitration,* 72 Harv.L.Rev. 1482 (1959). In order to flesh out the terms of the contract, it is necessary to look to the course of dealing between the parties. The leading case on this issue, *United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), provides some idea of the importance of past practices:

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective agreement although not expressed in it. *Id.* at 581, 80 S.Ct. at 1352.

As Professor Cox points out, some cases go so far as to "[argue] that a firmly established practice takes precedence over the plain meaning of words." [Footnote omitted.] Cox, *supra,* at 1500.

The practice under Article 9.02 has been clearly established. The provision was identical in both the 1971 agreement and the present agreement. Selection procedures until August 1975 were carried out using multiple lists—at least three such lists, and in important cases four or five. The testimony established that the AAA did not appoint arbitrators unilaterally upon the request of a party after the running of the 30-day period.[8] As for the 30-day period AAA Regional Director Reilly in his deposition ventured a guess that of the 800 cases between these parties, in only 15 was the arbitrator chosen within 30 days. The multiple list procedures are by nature time-consuming; the parties have recognized this in their dealings.

While it is true that Article 9.02 contained the same language in the 1971 and 1974 agreements, the fact that there was a modifying document (the October 16, 1972 letter) to the 1971 contract more clearly establishes the practice under the earlier agreement. There was never an attempt to enforce the 30-day period while that agreement was in force. Even if I were to find that Article 9.02 permits unilateral appointment by the AAA (which I do not), it is clear that the Union's acquiescence in the practice under the October 1972 agreement prevents it from now asserting the 30-day period as to cases submitted to arbitration while that agreement was in effect.

As I have indicated, the October 1972 agreement expired at the end of the 1971 contract. The parties, for whatever reasons, failed to include in the 1974 collective bargaining agreement a provision that would more closely approach the practices which they had adopted for selection of arbitrators. The 30-day period appears in the current contract.

There were some letters regarding the procedure in the fall of 1974, but no resolution of the question. The Company made it clear, especially in its letter of November 25, 1974, that unless there were objections to its past practice of not returning lists until the Union requested hearing, it intended to continue as before. This letter stood unchallenged as the last word on the matter until the Union initiated correspondence on May 14, 1975, insisting that the AAA take action on the overdue Company lists. During the interim the Union had continued to schedule the cases it wanted heard

8. AAA Labor Tribunal Administrator Chandler did testify that there had been one exception between August 1974, and July 1975—the period during which she administered these cases; she did not elaborate. One exception, however, would not vitiate a thoroughly documented past practice of the parties.

and the Company had then submitted its arbitrator lists. This was much the same practice as under the October 16 agreement, except that no formal priority list was maintained by the Union.

It is the view of the Court that the multiple list procedure is an established practice of the parties and is fully a part of the collective bargaining agreement. Further, since the Union acquiesced in the procedure followed by the Company, it cannot now invoke a time period which was ignored by the parties for nearly four years. On the other hand, the Court is unwilling to go so far as to hold that the language of the agreement providing for a 30-day period has no meaning in the face of past practice. The company agreed to the terms not once, but twice. Regardless of the practical difficulties the Company has agreed to arbitrate grievances and is bound to cooperate in good faith in the selection of an arbitrator. It should be noted, however, that the Company is not bound to permit the Union to exercise sole discretion in determining the order in which cases are to be heard.

The Union is understandably frustrated by the Company's recalcitrance in returning its lists. If, after the decision in this case, the Company refuses to recognize its duty to return the lists, the 30-day period could be invoked so long as it was used with the multiple list procedure. Further, the Union has the right under the contract to submit the matter to arbitration.

*Voluntary Labor Arbitration Rules*

The Union has taken the position that the AAA's Voluntary Labor Arbitration Rules are applicable to the selection of arbitrators. The 1971 and 1974 agreements contain the provision that "[h]earings and post-hearing activities shall be conducted in accordance with the Voluntary Labor Arbitration Rules. . . ." The selection of arbitrators would not appear to be a hearing or post-hearing activity, and, thus, the VLAR would not apply at this stage of arbitration. This conclusion is supported by the fact that the 1968 collective bargaining agreement between the Company and defendant's predecessor union specifically provided for the application of the VLAR to selection procedures. Company attorney McDonald testified that he made the change in 1971 to eliminate the application of the VLAR to the selection process. The non-application of the VLAR at this point in arbitration was also conceded by AAA Regional Administrator Reilly in his deposition.

Defendant Union asserts that the Company's conduct estops it to deny the applicability of the VLAR. The Court rejects that contention.

*AAA's Position*

Plaintiff has made much of the AAA's role in this matter and offered several possible motives for its action. Since the filing of this case the AAA has taken a neutral position, has filed no memoranda, and its attorney presented neither evidence nor argument at the hearing. While it appears that the AAA may have exceeded the authority which the parties gave it under the collective bargaining agreement, little is to be gained by belaboring the issue. The AAA has agreed to abide by the decision of the courts as to the construction of the agreement. I think it unnecessary and unwise to go beyond a declaration of the rights of the parties to the agreement. A determination of these rights should be adequate to advise the AAA of what its function ought to be in this matter. Moreover, I have grave doubts about whether the AAA is amenable to suit under § 301 of the National Labor Relations Act, 29 U.S.C. § 185, since it was not a party to the agreement.

*Suit against the International*

No evidence was adduced at the hearing which would make the International a proper party to this suit. International is not a party to the contract. Ac-

cordingly, the case is dismissed as to the International.[9]

*Relief*

Plaintiff has requested injunctive relief. It is the Court's position that an injunction is unnecessary and that the same ends can be served by a declaratory judgment. Accordingly, plaintiff is to submit a proposed form for declaratory judgment consistent with this opinion. Should it later appear that injunctive relief may be necessary, the Court would then take the appropriate action.

9. After this Opinion had been drafted, plaintiff moved to dismiss the International as a party without prejudice. The Court declines to do so. The International is dismissed with prejudice.