**Opinion issued November 5, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00413-CV

_____

### REBELLION ENERGY II, LLC, Appellant

### V.

### LIBERTY RESOURCES POWDER RIVER OPERATING, LLC AND LIBERTY RESOURCES MANAGEMENT COMPANY, LLC, Appellees

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-16000**

---

## MEMORANDUM OPINION

In this interlocutory appeal, appellant Rebellion Energy II, LLC, asserts that the trial court erred in denying its motion to compel arbitration. Because the parties' dispute is not within the scope of their narrow arbitration provision, the trial court did not err. We affirm.

## Background

Rebellion sued Liberty Resources Powder River Operating, LLC (Liberty Resources) and Liberty Resources Management Company, LLC (Liberty Management) (collectively, Liberty) in Harris County district court, seeking to compel arbitration and alternatively asserting claims for breach of contract and declaratory judgment. Liberty counterclaimed, asserting claims for declaratory judgment, breach of contract, and indemnity.

Rebellion moved to compel arbitration, and Liberty moved for summary judgment on its counterclaims. After a hearing in which the trial court denied the motion to compel arbitration, Rebellion brought this interlocutory appeal. We granted Rebellion's request to stay the litigation during the pendency of this appeal.

The parties' dispute arises out of a June 2018 Purchase and Sale Agreement (PSA) in which Rebellion acquired from Liberty certain oil and gas assets in Wyoming, with a defined purchase price of $106 million that was subject to upward and downward adjustments based on several provisions in the PSA. The sale closed on August 2, 2018, and Rebellion assumed all of Liberty's obligations under Liberty's contracts relating to the assets, including a Gas Gathering and Processing Agreement (GGPA) between Liberty and Thunder Creek Gas Services, LLC that was assigned to Rebellion in the PSA.

Under the GGPA, Thunder Creek, a third-party midstream services company, agreed to provide gathering and processing services in connection with the production of natural gas assets owned by Liberty (the Producer). The GGPA provided that, if Thunder Creek agreed to connect a new well to its gathering system and the Producer decided not to drill the well to the target depth or did not complete the well within 120 days of the notice, then the Producer would be obligated to reimburse Thunder Creek for all costs incurred in constructing facilities for that well.

Rebellion alleges in its suit that, in 2017, Liberty provided Thunder Creek with notice for two new wells named Habanero and Nine Mile. Rebellion contends that Liberty later—but before execution of the PSA— made the decision not to complete the Habanero and Nine Mile wells and that Thunder Creek invoiced Liberty the amount of $749,064.82 for its work on those wells.

Liberty, on the other hand, contends in its counterclaim that, while it did provide Thunder Creek with notice for the two new wells in 2017, it notified Thunder Creek in January 2018 that it was delaying completion of the wells. Liberty then provided Thunder Creek with new notices of completion for the two wells on June 19, 2018, and August 7, 2018, respectively. Liberty then alleges that, after the PSA closed and Rebellion assumed the GGPA, Rebellion decided not to complete the Habanero and Nine Mile wells and notified Thunder Creek of

its decision and that, as a result, on August 15, 2018, Thunder Creek sent Rebellion two invoices totaling $749,064.82 for the costs for the Habanero and Nine Mile wells.

When the PSA closed, Liberty and Rebellion jointly signed a Preliminary Settlement Statement that identified adjustments to the purchase price in accordance with Sections 3.3 and 3.4 of the PSA. On December 5, 2018, Liberty delivered a Final Settlement Statement to Rebellion that identified final adjustments to the purchase price in accordance with Sections 3.3 and 3.5 of the PSA. These adjustments included certain downward adjustments that the parties had previously agreed should be made to the purchase price under Section 3.3(b)(viii) of the PSA. The Thunder Creek invoices were not included in either the jointly executed Preliminary Settlement Statement or the Final Settlement Statement that Liberty delivered to Rebellion.

On December 14, 2018, Rebellion sent Liberty a dispute notice that included the Thunder Creek invoices in Liberty's Final Settlement Statement and attached a copy of the invoices. Rebellion's insertion of the Thunder Creek invoices allocated the invoices to Liberty and resulted in a downward purchase-price adjustment. Rebellion asserted that its inclusion of the Thunder Creek invoices in its dispute notice was based on Section 3.3(b)(viii), which allows for a

4

downward adjustment to the purchase price as "provided for elsewhere in this Agreement or otherwise agreed upon by Sellers and Buyer."

After its invoices were not paid for several months, Thunder Creek sent demands for payment to both Rebellion and Liberty of the outstanding invoices. On February 11, 2019, Liberty sent Rebellion a written indemnification notice explaining that Rebellion was required to pay the Thunder Creek invoices under the PSA and that Liberty was entitled to indemnification under the PSA for Rebellion's failure to pay the Thunder Creek invoices. Rebellion refused to pay the entire amount but eventually paid approximately 25% of the invoiced amounts.

Rebellion responded to Liberty's indemnification notice with a letter invoking the accounting arbitration provision in Article III of the PSA. Liberty replied to Rebellion that Article III's accounting arbitration was not the appropriate forum for their dispute.

While the underlying dispute between the parties is, ultimately, which party is liable for the Thunder Creek invoices under the PSA, the only issue before us is whether the Thunder Creek invoices can be included in the PSA's purchase-price adjustment mechanism so that the Thunder Creek invoices dispute is subject to Article III's accounting arbitration provision.

**Analysis**

We review a trial court's order denying a motion to compel arbitration for abuse of discretion, but whether the claims in dispute fall within the scope of a valid arbitration agreement is a question of law that we review de novo. *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018).

Rebellion asserts that, because the PSA involves interstate commerce and the parties are from different states, the Federal Arbitration Act (FAA) applies. *See, e.g.*, *In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67, 69 (Tex. 2005). Liberty does not contest the FAA's application, and both sides rely on federal and Texas case law, as do we.

Federal and Texas law strongly favor arbitration of disputes. *Prudential Sec., Inc. v. Marshall*, 909 S.W.2d 896, 898 (Tex. 1995); *see also IPFS Corp. v. Lopez*, No. 01-18-00145-CV, 2018 WL 6175119, at *2 (Tex. App.—Houston [1st Dist.] Nov. 27, 2018, no pet.) (mem. op.) ("Under the FAA, we resolve any doubts about whether claims fall within the scope of an arbitration agreement in favor of arbitration."). But the "policy of resolving doubts in favor of arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties or allow modification of the plain and unambiguous provisions of an agreement." *Belmont Constructors, Inc. v. Lyondell Petrochemical Co.*, 896 S.W.2d 352, 356 (Tex. App.—Houston [1st Dist.] 1995, writ denied); *see also Steelworkers v.*

*Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [the party] has not agreed so to submit."). A party seeking to compel arbitration under the FAA must establish that a valid arbitration agreement exists and that the claims at issue fall within the agreement's scope. *IPFS Corp.*, 2018 WL 6175119, at *2 (citing *Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 227 (Tex. 2014)).

Courts distinguish between "narrow" and "broad" arbitration clauses. *See In re Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754 (5th Cir. 1993); *Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 888 n.5 (3d Cir. 1992); *McDonnel Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988). We must first determine if the scope of the arbitration provision is broad or narrow. *N. Am. Deer Registry, Inc. v. DNA Sols., Inc.*, No. 4:17-CV-00062, 2017 WL 2120015, at *4 (E.D. Tex. May 16, 2017) (citing *Jones v. Halliburton Co.*, 583 F.3d 228, 235 (5th Cir. 2009); and *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998)). Broad arbitration provisions are generally those that apply to "any dispute" or "all disputes" arising from an agreement. *Hornbeck Offshore*, 981 F.2d at 755. Narrow arbitration provisions, on the other hand, "expressly limit the range of disputes to a single category or function." *Trap Rock*, 982 F.2d at 888 n.5. "[I]f the clause is

narrow, the matter should not be referred to arbitration or the action stayed, unless the court determines that the dispute falls within the clause." *Hornbeck Offshore*, 981 F.2d at 755.

We now return to the PSA. It is undisputed that the PSA does not contain a broad arbitration clause. It does have, however, a jurisdiction-consent and forum-selection clause. Section 15.15 provides that the parties "CONSENT TO THE EXERCISE OF JURISDICTION IN PERSON BY THE FEDERAL AND STATE COURTS OF HARRIS COUNTY, TEXAS, FOR ANY ACTION ARISING OUT OF THIS AGREEMENT."

The arbitration clause relied on by Rebellion is within Article III of the PSA, which is entitled "Purchase Price." Article III sets the $106 million purchase price for the transaction and then provides mechanisms for the upward and downward purchase-price adjustments that may be listed in a settlement statement or dispute notice. Section 3.3(a) provides that "[t]he Purchase Price shall be adjusted upward by the following amounts" and specifically identifies the categories of adjustments that may be made to adjust the purchase price upward. Section 3.3(b) provides that "[t]he Purchase price shall be adjusted downward by the following amounts" and specifically identifies the categories of adjustments that may be made to adjust the purchase price downward. Section 3.3(b)(viii)

allows for a downward adjustment as "provided for elsewhere in this Agreement or otherwise agreed upon by Sellers and Buyer."

The mechanisms for effectuating adjustments to the purchase price were set forth in Sections 3.4 and 3.5. Section 3.4 requires Liberty to provide a pre-closing "preliminary settlement statement" that "shall set forth the Adjusted Purchase Price, reflecting each adjustment made in accordance with this Agreement as of the date of such Statement." If Rebellion objects to the preliminary settlement statement, it is required to deliver a written report containing all proposed changes. The closing is then based on the Preliminary Settlement Statement as agreed by the parties or, absent such agreement, the Preliminary Settlement Statement as submitted by Liberty.

Section 3.5 requires Liberty to provide, on or before 120 days after closing, a Final Settlement Statement "based on actual income and expenses during the period from and after the Effective Time until Closing and which takes into account all final adjustments made to the purchase price." Then, no later than thirty days after receipt of the Final Settlement Statement, Rebellion must deliver a written report (the Dispute Notice) containing any proposed changes to the Final Settlement Statement and an explanation of such changes and the reasons therefor.

Section 3.6 then sets forth the arbitration clause relied on by Rebellion. It provides:

***3.6*** ***Disputes.*** If Sellers and Buyer are unable to resolve the matters addressed in the Dispute Notice, each of Buyer and Sellers shall within 14 Business Days after the delivery of such Dispute Notice, summarize its position with regard to such matters in the Dispute Notice in a written document of twenty pages or less and submit such summaries to the Denver office of Deloitte LLP or such other Person as the Parties may mutually select (subject to the last sentence in this *Section 3.6,* the "***Accounting Arbitrator***"), together with the Dispute Notice, the Final Settlement Statement and any other documentation such Party may desire to submit. Within 20 Business Days after receiving the Parties' respective submissions, the Accounting Arbitrator shall render a decision choosing either Sellers' position or Buyer's position with respect to each matter addressed in any Dispute Notice, based on the materials described above. Any decision rendered by the Accounting Arbitrator pursuant hereto shall be final, conclusive and binding on Sellers and Buyer and will be enforceable against any of the Parties in any court of competent jurisdiction. The costs of such Accounting Arbitrators shall be borne one-half by Buyer and one-half by Sellers. In the event that Deloitte LLP declines to serve as the Accounting Arbitrator and the Parties are unable to agree, within 5 Business Days of Deloitte LLP declining to so serve, upon another Person to serve as Accounting Arbitrator, then the Accounting Arbitrator shall be selected by lot from among the independent national accounting firms that have not represented any Party or its Affiliates at any time during the three year period of time immediately preceding its designation hereunder.

As mentioned, Rebellion sent Liberty a Dispute Notice including the Thunder Creek invoices in Liberty's Final Settlement Statement. Rebellion allocated the Thunder Creek invoices to Liberty, which resulted in a downward purchase-price adjustment. Rebellion asserted that its inclusion of the Thunder Creek invoices in its dispute notice was based on Section 3.3(b)(viii), which allows for a downward adjustment to the purchase price as "provided for elsewhere in this Agreement or otherwise agreed upon by Sellers and Buyer." The precise

10

issue, therefore, is whether, under the PSA, Rebellion could then include the Thunder Creek invoices so that they were subject to Section 3.6's narrow accounting arbitration provision.

Rebellion's argument is that the plain language of the dispute resolution provision of Section 3.6 covers "the matters addressed in the Dispute Notice" and Rebellion's Dispute Notice clearly and unambiguously included its contention that the Thunder Creek invoices should be included in the Final Settlement Statement as a downward purchase-price adjustment under Section 3.3(b), which lists, as a category of costs subject to downward adjustment, "any other amount provided for elsewhere in this Agreement." Rebellion asserts that the purchase-price adjustment is proper under Section 3.3(b)(viii) on the basis of Section 2.3(a), regarding Property Expenses, and/or Sections 8.2 and 8.3(d), governing Specified Obligations. Therefore, according to Rebellion, on its face, the arbitration provision covers the dispute in question.

To determine whether a particular dispute falls within the scope of a narrow and specific arbitration clause, we must consider the context in which the language appears. *Baudoin v. Mid-Louisiana Anesthesia Consultants, Inc.*, 306 F. App'x 188, 192 (5th Cir. 2009) (finding "district court erred by looking at the language in the arbitration clause in isolation, without considering the context under which that language appears"). We also must "examine and consider the entire writing in an

11

effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "When determining whether claims fall within the scope of the arbitration agreement, we look to the factual allegations, not the legal claims." *IPFS Corp.*, 2018 WL 6175119, at \*2 (quoting *Rachal v. Reitz*, 403 S.W.3d 840, 850 (Tex. 2013)).

We first look to the allegations in Rebellion's suit. Rebellion's petition alleges that the amount in dispute is owed by Liberty under Section 2.3(a) of the PSA regarding "Property Expenses" and under Article VIII regarding "Specified Obligations." Neither of these PSA sections allow for purchase-price adjustments under Article III. Likewise, Liberty's counterclaims have no relationship to Article III purchase-price adjustments. Instead, they are based upon the "Assumed Obligations" and "Indemnification" provisions of Article VIII.

We agree with Liberty that Article VIII of the PSA—not Article III— governs disputes over third-party payments and therefore governs the disputes in this case. The Thunder Creek invoices were sent to Rebellion under the GGPA, which is defined as an Applicable Contract in the PSA. Section 8.1(b) governs all "obligations and liabilities relating in any manner to the Applicable Contracts" regardless of when such obligations or liabilities arose. And Section 8.1(e) governs "Third Party Claims consisting of unpaid Property Expenses."

12

The "Specified Obligations" provision in the PSA that Rebellion's petition references, is also found in Article VIII (Section 8.2) and references "Third Party claims consisting of unpaid Property Expenses attributable to periods prior to the Effective Time." Also, Section 8.3(d), which Rebellion's brief references, is governed by Article VIII and expressly makes any claims "arising from, based upon, related to, or associated with" "any of the Specified Obligations" subject to indemnification.

Additionally, Liberty's indemnification claim for Rebellion's failure to pay the Thunder Creek invoices is governed by Article VIII, Section 8.4. Article VIII expressly includes "Third Party claims consisting of unpaid Property Expenses" as being subject to indemnification. These claims do not implicate the purchase-price adjustments in Section 3.3 of Article III.

For its contention that this dispute falls within the accounting arbitration clause because Rebellion's Dispute Notice indicated the Thunder Creek invoices should be downward purchase-price adjustments under Section 3.3(b), Rebellion solely relies on Section 3.3(b)(viii), which allows downward purchase price adjustments for "any other amount provided for elsewhere in this Agreement or otherwise agreed upon by Sellers and Buyer." According to Rebellion, "the purchase price adjustment [for the Thunder Creek invoices] is proper under this 'provided for elsewhere in this Agreement' category on the basis of Section 2.3(a),

regarding Property Expenses, and/or Section 8.2 and 8.3(d), governing Specified Obligations." But as Liberty points out, Sections 2.3, 8.2, and 8.3 do not have arbitration clauses or refer to Section 3.6's accounting arbitration clause.

Therefore, considering all of the PSA provisions, it is evident the parties did not intend to include disputes arising under "Section 2.3(a), regarding Property Expenses, and/or Section 8.2 and 8.3(d), governing Specified Obligations" (or disputes regarding Assumed Obligations or indemnification under Article VIII) within the "other amount provided for elsewhere in this Agreement" purchase-price adjustment category.

Section 3.3(b)(viii) provides that this adjustment category only applies to specified "amounts" that the parties expressly agreed in the PSA to include as an adjustment in the Settlement Statement. Liberty explains, for example, that Section 13.3(b) expressly provides that Casualty Loss amounts shall be paid "by adjustment in the Preliminary Settlement Statement, an amount equal to the actual amount of such Casualty Loss." Section 13.4(b) similarly references adjustments to the purchase price for assets excluded because of a failure to obtain assignment consents and explains "the Purchase Price shall be reduced by the Allocated Value of the Assets so excluded . . . as such amount is appropriately adjusted in accordance to *Section 3.3*." We agree that these provisions demonstrate the parties' intent to include adjustments for amounts for Casualty Loss and Assignment

14

Consents within the category of amounts "otherwise provided in the Agreement." These provisions also demonstrate the parties' ability to otherwise provide for adjustments for other amounts in the Agreement.

The words "or otherwise agreed upon by Sellers and Buyer" in Section 3.3(b)(viii) emphasize that any adjustment amount in this category that is not expressly provided in the PSA must be "agreed upon" by the parties. This emphasis on agreement harmonizes with the language in Section 2.3(b) that indicates that Property Expense amounts that are paid before delivery of the Final Settlement Statement shall be accounted for in the Final Settlement Statement, but unpaid invoices "owed by the other Party" are not included in the Final Settlement Statement unless they are "agreed to, or deemed agreed to, by the Parties." Correspondingly, Section 3.3(a)(ii) indicates that Property Expenses paid by Liberty shall be included as upward purchase-price adjustments, but Section 3.3(b) does not include unpaid Property Expenses as downward purchase-price adjustments unless they are agreed to by the parties.

If the parties had intended to allow downward purchase-price adjustments for unpaid Property Expenses under Section 2.3 or for Specified Obligations under Article VIII, they could have expressly provided for that in Section 3.3 like they had done in Section 3.3(a)(ii) for upward purchase-price adjustments. The parties instead made such claims subject to indemnification under Article VIII. Nothing in

Section 3.3 or elsewhere in the PSA suggests that unpaid Property Expenses, Assumed Obligations, Specified Obligations, or indemnification may be used to adjust the purchase price, unless such adjustment is agreed to.

Rebellion's claim that any dispute arising under the PSA may be forced before an accounting arbitrator simply by Rebellion's inclusion of it in a Dispute Notice would produce absurd results and force an accounting arbitrator to determine complex legal disputes never intended for an accountant to decide. Liberty points out, for example, that the term "Specified Obligations" not only includes disputes about "unpaid Property Expenses," but also includes disputes about "offsite Third-Party disposal of Hazardous Substances" and alleged "gross negligence or willful misconduct [of Liberty]." Nothing in Article VIII or elsewhere in the PSA suggests that the parties intended an accounting arbitrator to decide such disputes. Rebellion's interpretation would also improperly render meaningless the parties' agreement in Section 15.15 to resolve contractual disputes in court. *See J.M. Davidson, Inc.*, 128 S.W.3d at 229 (stating that courts must "examine and consider the entire writing in an effort to harmonize and give effect to all provisions so that none are rendered meaningless").

Last, we disagree with Rebellion's apparent suggestion that an accounting arbitrator would have the authority to decide whether the dispute over the Thunder Creek invoices falls within the scope of Article III and therefore determine whether

the dispute is arbitrable. "[A]bsent unmistakable evidence that the parties intended the contrary, it is the courts rather than arbitrators that must decide 'gateway matters'" of arbitrability. *In re Weekley Homes, LP*, 180 S.W.3d 127, 130 (Tex. 2005); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide."). Furthermore, nothing in the PSA delegates any authority for an accounting arbitrator to decide gateway issues of arbitrability.

## Conclusion

The trial court correctly concluded that this dispute falls outside the narrow accounting arbitration clause. We affirm the trial court's order and lift our stay of the litigation.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.